[S. F. No. 21152. In Bank. March 12, 1963.]

LILLIAN AMAYA, Plaintiff and Appellant, v. HOME ICE, FUEL AND SUPPLY COMPANY et al., Defendants and Respondents.

Thompson, Sherbourne & Oppen and James J. Oppen for Plaintiff and Appellant.

Belli, Ashe & Gerry, Seymour L. Ellison, William P. Camusi, Edward I. Pollock, Theodore A. Horn, Ned Good, David M. Harney, Abe Mutchnik, William J. Pollack, S. M. Dana and James G. Butler as Amici Curiae on behalf of Plaintiff and Appellant.

Berry, Davis, Channell & McNamara, Clark, Heafey & Martin, Herbert Chamberlin, Woodrow W. Kitchel, Appelbaum, Mitchell & Bennett and Robert M. Davis for Defendants and Respondents.

SCHAUER, J.—Plaintiff Lillian Amaya appeals from a judgment of dismissal entered upon an order sustaining de-

fendants' general demurrer to her complaint[1] after she had declined an opportunity to amend.

 The sole issue is whether liability may be predicated on fright or nervous shock (with consequent bodily illness) induced solely by the plaintiff's apprehension of negligently caused danger or injury to a third person. After a comprehensive review of the authorities and the several considerations underlying decision on this issue, we have concluded that the complaint does not state facts sufficient to constitute a cause of action and that the judgment should therefore be affirmed.

In the subject complaint plaintiff-appellant alleges that she is the mother of James Amaya; that at the time of the accident she was seven months pregnant, and James was 17 months of age; that on that day she "was standing near her said infant son, watching over him" and "observed the negligent conduct of the defendants . . . as the said defendants' truck was bearing down upon" James; that she shouted a warning to defendants, but they failed to stop the truck and ran over the boy; and that she "was compelled to stand helpless and watch her infant son be struck and run over by the defendants' truck." She then alleges that as a "direct and proximate result" of the defendants' negligent operation of their truck she "suffered an emotional shock and great mental disturbance . . . and became violently ill and nauseous [sic] and was hurt and injured in her health, strength and activity, sustaining injury to her body and shock and injury to her nervous system and person. . . ." She further alleges on information and belief that such injuries "will result in some permanent disability," and prays for general damages in the amount of $50,000, medical expenses, and other relief.

Plaintiff states in her opening brief that "The Court offered plaintiff's counsel the opportunity to amend and state that the fright and shock suffered by the plaintiff was for the fear of her own safety. Plaintiff's counsel declined[,] stating to the Court that the plaintiff suffered fright and shock as a result of being compelled to watch her infant child crushed beneath the wheels of an ice truck, and that all the fright and shock she suffered was as a result of her fear for the safety of her child, and not out of fear for her own safe-

---

[1]The complaint as filed in the trial court was in two counts. In Count I, however, James Amaya, who is not a party to this appeal, was the plaintiff. It is Count II, in which Lillian Amaya is sole plaintiff, that presents the issue before us.

ty." Defendants assert that they "accept this volunteer statement as a stipulation by [plaintiff]," and we treat it therefore as an amendment to the complaint.

This court has not yet ruled specifically on whether allegations such as those of the subject complaint are sufficient to constitute a cause of action.[2] ▬ At the outset it is necessary to determine whether or not the "impact rule" is in force in California: i.e., in an action for personal injuries resulting from the internal operation of negligently induced fright or shock, need the plaintiff show that there was some contemporaneous physical impact upon her person? (See generally 64 A.L.R.2d 100 et seq.) If the "impact rule" prevails it is at once evident that for such reason alone the complaint in the case at bench fails to state a cause of action. Relying on *Sloane* v. *Southern Cal. Ry. Co.* (1896) 111 Cal. 668, 680 [44 P. 320]—which dealt, however, with the analytically different question of whether "nervous disturbance" caused by fright or shock "was a suffering of the body or of the mind"—it has apparently been held by the District Court of Appeal that the "impact rule" is not the law of this state. (*Cook* v. *Maier* (1939) 33 Cal.App.2d 581, 584 [5]- 585 [6] [92 P.2d 434].) No California decision has been found declaring such a requirement, and we are not disposed to introduce it into our law now. We hold, accordingly, that plaintiff's failure to allege a contemporaneous physical impact upon her person is not, of itself, fatal to her attempt to state a cause of action.

We therefore face this question: May tort liability be predicated on fright or nervous shock (with consequent bodily illness) induced solely by the plaintiff's apprehension of negligently caused danger or injury to a third person? Prior to today that question had been raised in three cases before this court, and in each the court expressly declined to resolve it.

[2]No assistance is to be found in the statutes. Civil Code section 3333 provides that "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment *proximately caused thereby,* whether it could have been *anticipated or not.*" (Italics added.) But as is correctly pointed out in *Reed* v. *Moore* (1957) 156 Cal.App.2d 43, 47 [5] [319 P.2d 80], "This section has to do only with the measure of damages for tortious wrong and operates only after such a cause of action has been made out. It declares no rule of liability." Equally unhelpful is the general declaration in Civil Code section 1714 that "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person. . . ."

(*Easton* v. *United Trade School Contr. Co.* (1916) 173 Cal. 199, 202 [159 P. 597, L.R.A. 1916A 394] ; *Lindley* v. *Knowlton* (1918) 179 Cal. 298, 301-302 [176 P. 440] ; *Webb* v. *Francis. J. Lewald Coal Co.* (1931) 214 Cal. 182, 184 [1] [4 P.2d 532, 77 A.L.R. 675].) In *Easton* the court found it unnecessary to rule on the matter in view of its determination that the plaintiff's fright was, at least in part, a direct consequence of physical injuries inflicted on her in a collision caused by the defendant's negligence; hence recovery could be justified under the principle (*id.* at p. 203 of 173 Cal.) that "mental anguish as a direct reasonable outcome of the illegal physical injuries is always an element of damage." In *Lindley* and *Webb* the court avoided the issue by holding that in each instance the case fell within the rule—to which we adhere—that liability may be predicated upon fright and consequent illness induced by the plaintiff's reasonable fear for her *own* safety, even when the plaintiff may also have feared for the safety of her children (*Lindley*) or of a stranger (*Webb*).[3]

The first California case to rule on the question now presented appears to have been *Clough* v. *Steen* (1934) 3 Cal. App.2d 392 [39 P.2d 889]. There the plaintiff and her husband and minor child were involved in an accident with the defendant's automobile, in which the plaintiff was injured and her son was killed. In her complaint she set forth the extent of her own injuries "and then alleged that the

[3]In *Lindley* the defendant urged that the authorities were uniform in upholding the rule that no recovery may be had for fright or shock caused solely by apprehended danger to a third person. By way of dictum the court remarked (at p. 301 of 179 Cal.) that "there is excellent authority to the contrary," citing *Hill* v. *Kimball* (1890) 76 Tex. 210 [13 S.W. 59, 7 L.R.A. 618], *Wilkinson* v. *Downton* [1897] 2 Q.B. 57, and *Cohn* v. *Ansonia Realty Co.* (1914) 162 App.Div. 791 [148 N.Y.S. 39]. None of these three decisions, however, is in fact "authority to the contrary" insofar as the apprehended danger is brought about—as in *Lindley* and in the case at bench—negligently rather than intentionally. Thus in *Hill* the defendant entered on the plaintiff's property and intentionally assaulted two negroes in her presence, knowing her to be in an advanced state of pregnancy. In *Wilkinson* the defendant falsely informed the plaintiff, as a "practical joke," that her husband had been seriously injured; the court found this to be an act "wilfully done" and "calculated to cause physical harm to the plaintiff. . . ." In *Cohn* the opinions did not discuss the problem now before us but dealt instead with entirely different questions, e.g., whether the plaintiff need prove resulting physical injuries in order to recover for fright; as will hereinafter be shown, the courts of New York uniformly deny recovery in our situation. Misled by the *Lindley* dictum, nevertheless, the court in *Kelly* v. *Fretz* (1937) 19 Cal.App.2d 356, 362 [3] [65 P.2d 914], inaccurately stated that "If [the verdict] rested upon the element of fright produced by fear for the safety of [plaintiff's] child, the authorities differ on the right of recovery."

knowledge of the tragic death of her son 'immediately threw her into a state of profound shock' which caused mental and physical disorders for which she sought damages.'' (*Id.* at p. 393.) The District Court of Appeal reversed a judgment for the plaintiff, distinguishing *Lindley* and holding that ''no case or rule of law has been brought to our attention which would support a recovery by plaintiff for the shock and grief, or injury consequent thereto, growing out of the knowledge of the death of her child. In the absence of such a right at common law or by statute, the plaintiff's recovery cannot be upheld.'' (*Id.* at p. 394 [2].)

Two federal decisions applying California law reached similar conclusions. In *Minkus* v. *Coca-Cola Bottling Co. of California* (N.D. Cal. 1942) 44 F. Supp. 10, a minor sued for personal injuries suffered by finding a decomposed mouse in a soft drink that he had partly consumed; in separate counts his parents sought damages ''for nervous shock alleged to have been caused by the happening mentioned.'' The court granted a motion to dismiss the latter counts, citing *Clough* v. *Steen* (1934), *supra*, 3 Cal.App.2d 392, and holding the matter to be controlled by ''the general rule that one may not recover damages for fright or mental shock from injuries received by another when the claimant himself sustained no physical injury.''

In *Maury* v. *United States* (N.D. Cal. 1956) 139 F. Supp. 532, an action by parents for the wrongful death of their child, the plaintiffs sought to add a second cause of action based on allegations that ''during the fire which destroyed the home of plaintiffs [allegedly caused by the defendants' negligence], plaintiffs were present; that plaintiffs with full knowledge that their child was in the said burning house, suffered extreme fright, shock and mental anguish'' causing the plaintiff mother to have a nervous breakdown and be confined in a hospital. The motion to add the second count was denied. The court characterized the proposed amendment as follows (*id.* at p. 533 [1]) : ''In essence this is a claim for damages produced by shock from fear of danger or harm to another, where the danger or harm was caused by ordinary negligence, and where the claimant was not himself endangered or harmed.'' The court then observed that the general rule was contrary to the plaintiffs' theory, and held that the California cases (citing, e.g., *Clough* v. *Steen*) were in accord with that rule. In so holding the court properly distinguished (*id.* at p. 534 [1]) our decisions dealing with

intentional infliction of mental suffering (*State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 336-339 [1-4] [240 P.2d 282]) and intentional invasion of a protectible interest of an occupant of real property resulting in "mental suffering occasioned by fear for the safety of himself and his family" (*Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328, 337 [10] [5 Cal.Rptr. 686, 353 P.2d 294], and cases there cited).

Finally, the precise question now before us was presented in *Reed* v. *Moore* (1957), *supra,* 156 Cal.App.2d 43, 47 [4]. In that case the plaintiff, seated in front of her place of abode, was an eyewitness to a collision approximately 130 feet away, between an automobile in which her husband was riding and one driven by the defendant. In her complaint she alleged that as the "direct and proximate result" of seeing the collision caused by the defendant's negligence she suffered mental shock, fright, and the customary miscarriage. It was stipulated that at the time of the accident the plaintiff was in fear solely for her husband's safety and could not herself be considered in the zone of danger. A general demurrer was sustained without leave to amend. The District Court of Appeal correctly distinguished *Lindley* v. *Knowlton* (1918), *supra,* 179 Cal. 298, on the ground that "The case, therefore, is authority to sustain the rule that physical injury due to fright or shock as a result of fear for one's own safety is compensable. It is not, however, authority to sustain an action for damages produced by an apprehended danger or peril to a third person." (*Reed* v. *Moore* (1957), *supra,* 156 Cal.App.2d 43, 45 [1].) Relying on the general rule of nonliability set forth in the encyclopedias, on *Clough* v. *Steen* (1934), *supra,* 3 Cal.App.2d 392, and on other cases discussed hereinabove, the court in affirming the judgment of dismissal specifically held (p. 47 [4] of 156 Cal.App.2d) that "since the detriment to the plaintiff ensued not by reason of any fear for her own safety but by fear of an act which impinged upon the husband alone, she may not recover for her alleged injury."

Under the existing law of California, accordingly, the trial court in the case at bench did not err in sustaining defendants' demurrer and entering judgment thereon.

Turning now to the general rule of nonliability relied upon in *Reed* v. *Moore* (1957), *supra,* it appears from extensive research that the cases, both early and recent, fully support the following statement of that rule: "As a gen-

eral rule, no recovery is permitted for a mental or emotional disturbance, or for a bodily injury or illness resulting therefrom, in the absence of a contemporaneous bodily contact or independent cause of action, or an element of wilfulness, wantonness, or maliciousness, in cases in which there is no injury other than one to a third person, even though recovery would have been permitted had the wrong been directed against the plaintiff. The rule is frequently applied to mental or emotional disturbances caused by another's danger, or sympathy for another's suffering. It has been regarded as applicable to a mental or emotional disturbance resulting from an injury not only to a stranger, but also to a relative of the plaintiff, such as a child, sister, father, or spouse." (52 Am. Jur., Torts, § 70, p. 417; footnotes omitted.)[4]

[4]'It is commonly said that there have been three or four cases to the contrary (e.g., Prosser, Torts (2d ed. 1955), p. 181), but a careful reading of the opinions cited for the statement discloses that none is in fact inconsistent with the just quoted general rule of nonliability. Thus in *Spearman* v. *McCrary* (1912) 4 Ala. App. 473 [58 So. 927], a mother was allowed to recover for shock resulting when the defendant's automobile negligently frightened a mule pulling a buggy with the plaintiff's two children, from which the plaintiff had just alighted; the question now before us was not raised, however, and the opinion is devoted to the wholly distinct issue of the ''impact rule.'' (For a more relevant Alabama decision, see *Tyler* v. *Brown-Service Funeral Homes Co.* (1948) 250 Ala. 295 [34 So.2d 203, 205 [2-3]] [no duty to plaintiff wife who suffers mental anguish on finding her husband negligently left by defendants unattended and in a sick and freezing condition].) In *Gulf, C. & S.F. Ry. Co.* v. *Coopwood* (Tex.Civ.App. 1906) 96 S.W. 102, 105-106, a mother was allowed to recover for mental distress suffered when the defendant's agents wrongfully ejected her and her invalid daughter from a train; yet recovery was predicated not on negligence but on a breach of the contractual duty owed to the plaintiff as a paying passenger on the defendant railroad. (Compare *Gulf, C. & S.F. Ry. Co.* v. *Overton* (1908) 101 Tex. 583 [110 S.W. 736, 737, 19 L.R.A. N.S. 500] [same transaction, but recovery denied to a different daughter because she was ''not a party to the contract'' involved in *Coopwood*]; for a more relevant Texas case, see *Carey* v. *Pure Distributing Corp.* (1939) 133 Tex. 31 [124 S.W.2d 847, 850 [5]] [recovery denied to wife for miscarriage allegedly caused by shock of hearing commotion incident to injury of husband, then seeing the latter covered with blood].) The third case frequently cited in this connection, *Cohn* v. *Ansonia Realty Co.* (1914), *supra*, 162 App.Div. 791 [148 N.Y.S. 39], has already been distinguished (*ante*, fn. 3). In *Rasmussen* v. *Benson* (1937) 133 Neb. 449 [275 N.W. 674, 122 A.L.R. 1468], *id.* (1938) 135 Neb. 232 [280 N.W. 890, 122 A.L.R. 1475], recovery was allowed (apparently under a Nebraska survival statute) for illness and death following emotional distress suffered when the plaintiff's decedent fed to his dairy cows a sack of poisoned bran that the defendant had negligently sold to him; it appears that the decedent feared not only for the safety of his customers but also for the health of his cattle and the survival of his dairy business which was ''his livelihood and that of his family'' (*id.* at p. 892 of 280 N.W.) Equally distinguishable are *Frazee* v. *Western Dairy Products* (1935) 182 Wash. 578 [47 P.2d 1037], *Bowman* v. *Williams* (1933) 164 Md. 397 [165 A. 182] and *Hambrook* v. *Stokes*

In every jurisdiction that has ruled on this precise question—some 18 in addition to California—the decisions appear to be uniform in upholding the rule of nonliability. Most of the leading cases prior to 1950 are collected in the annotation published in 18 American Law Reports 2d 220 et seq. Of these the most well known is *Waube* v. *Warrington* (1935) 216 Wis. 603 [258 N.W. 497, 98 A.L.R. 394], a wrongful death action in which a husband sought damages for the death of his wife allegedly caused by nervous shock suffered when the latter, looking out of the window of her house, saw her daughter who was crossing the highway struck and killed by an automobile negligently operated by the defendants. The Wisconsin Supreme Court unanimously held that liability for such negligence does not extend to "any recovery for physical injuries sustained by one out of the range of ordinary physical peril as a result of the shock of witnessing another's danger." (*Id.* at p. 501 [2-4] of 258 N.W.) The court accordingly directed the sustaining of the defendants' general demurrer.

Since 1950 at least a dozen more cases have so held, and we have discovered none that has held to the contrary of the general rule. (See, e.g., *Berg* v. *Baum* (Misc. 1962) 224 N.Y.S.2d 974, 976; *Lahann* v. *Cravotta* (Misc. 1962) 228 N.Y.S.2d 371, 372-373 [1-5]; *Strazza* v. *McKittrick* (1959) 146 Conn. 714 [156 A.2d 149, 152 [3, 4]; *Lessard* v. *Tarca* (1957) 20 Conn. Super. 295 [133 A.2d 625, 627-628 [2-4]]; *Klassa* v. *Milwaukee Gas Light Co.* (1956) 273 Wis. 347 [77 N.W.2d 397, 403-404 [4]]; *King* v. *Phillips, supra,* [1953] 1 Q.B. 429; *Resavage* v. *Davies* (1952), *supra,* 199 Md. 479 [86 A.2d 879].)[5]

---

*Bros.* [1925] 1 K.B. 141. (Considerable doubt has been cast on each of the latter two decisions by, respectively, *Resavage* v. *Davies* (1952) 199 Md. 479 [86 A.2d 879], and *King* v. *Phillips* [1953] 1 Q.B. 429.) For related cases see *Penick* v. *Mirro* (E.D. Va. 1960) 189 F. Supp. 947, 948 [plaintiff also feared for her own safety]; *State* ex rel. *Gaegler* v. *Thomas* (D.C. Md. 1959) 173 F. Supp. 568, 573 [5, 6] [plaintiff also injured in the accident]; *Greenberg* v. *Stanley* (1958) 51 N.J. Super. 90 [143 A.2d 588, 597 [9]-598 [10]] [same].

[5]Other recent decisions recognizing or applying the general rule of nonliability are: *Preece* v. *Baur* (D.C.E.D. Idaho 1956) 143 F.Supp. 804, 806 [3] [parents' shock at seeing house burn with children inside] (applying Utah law); *Angst* v. *Great Northern Ry. Co.* (D.C. Minn. 1955) 131 F.Supp. 156, 159 [1-5] [train conductor's fear of injury to fellow worker in collision]; *Williamson* v. *Bennett* (1960) 251 N.C. 498 [112 S.E.2d 48, 55 [4]] [woman driver's shock in believing she had collided with child]; *Van Hoy* v. *Oklahoma Coca-Cola Bottling Co.* (1951) 205 Okla. 135 [235 P.2d 948, 949 [1-2]] [fear of injury to fellow worker];

The modern unanimity of view upon the issue now before us is reflected in the evolution of the relevant section of the Restatement of Torts. As it originally read in the first Restatement (1934), section 313[6] was qualified by a caveat, to wit: ''The Institute expresses no opinion as to whether an actor whose conduct is negligent as involving an unreasonable risk of causing bodily harm to a child or spouse is liable for an illness or other bodily harm caused to the parent or spouse who witnesses the peril or harm of the child or spouse and thereby suffers anxiety or shock which is the legal cause of the parent's or spouse's illness or other bodily harm.'' In the current revision of the Restatement (Tent. Draft No. 5 (1960) p. 9) the just quoted caveat is stricken and the general rule of nonliability is substituted, as follows: ''(2) The rule stated in Subsection (1) [i.e., former § 313, *ante*, fn. 6] has no application to illness or bodily harm of another, caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.'' The reason for the change is given (*ibid.*) in a Note to the Institute: ''The Caveat is stricken, and Subsection (2) is substituted, because of the overwhelming weight of the case law.''[7] And directly in point in the case at bench is comment d to the new subsection (2), which reads: ''Thus, where the actor negligently runs down and kills a child in the street, and its mother, in the immediate vicinity, witnesses the event and suffers severe emotional distress, resulting in a

cf. *Vinet* v. *Checker Cab Co.* (La.App. 1962) 140 So.2d 252, 256 [5-6] [father's mental anguish at seeing daughter's injuries]; *All* v. *John Gerber Co.* (1952) 36 Tenn.App. 134 [252 S.W.2d 138, 142 [11-12]] [husband's mental anguish at seeing wife's injuries].

[6]Section 313 provided:

''If the actor unintentionally causes emotional distress to another, he is liable to the other for illness or bodily harm of which the distress is a legal cause if the actor

''(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

''(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.''

[7]The Note continues: ''The Advisers are unanimous in wishing to retain the Caveat, for its possible effect upon the courts—although it must be conceded that it has thus far had no effect. The Reporter is in sympathy with this position, and feels that there should be liability to a mother who suffers a heart attack when she sees her child killed before her eyes. He is compelled, however, to recognize that the decisions are otherwise. *The Council are agreed that the Caveat should go out, and the definite rule of non-liability should be stated.*'' (Italics added.)

heart attack or other bodily harm to her, she cannot recover for such bodily harm unless she was herself in the path of the vehicle, or was in some other manner threatened with bodily harm, otherwise than through the emotional distress at the peril to her child.'' (Rest. 2d Torts, Tent. Draft No. 5 (1960) p. 12.)

The law of California as declared in *Reed* v. *Moore* (1957), *supra,* 156 Cal.App.2d 43, is in complete accord with these authorities. ▉ A majority of this court voted to deny a hearing in *Reed,* and ''Its judgment stands, therefore, as a decision of a court of last resort in this state, until and unless disapproved by this court or until change of the law by legislative action.'' (*Cole* v. *Rush* (1955) 45 Cal.2d 345, 351 [4] [289 P.2d 450, 54 A.L.R.2d 1137].) ▉ ''Although this court's denial of a hearing is not to be regarded as expressing approval of the propositions of law set forth in an opinion of the District Court of Appeal or as having the same authoritative effect as an earlier decision of this court [citations], it does not follow that such a denial is without significance as to our views [citations].'' (*DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 178 [12] [18 Cal. Rptr. 369, 367 P.2d 865].) In the five years that have elapsed since *Reed*—indeed, in the nearly three decades since *Clough* v. *Steen* (1934), *supra,* 3 Cal.App.2d 392—the Legislature has not seen fit to act in this connection, and has adopted no statute inconsistent with the common law rule of nonliability. The remaining question is whether we should nevertheless now abrogate that rule in California by judicial decision.

No guidance is to be found in such maxims as ''For every wrong there is a remedy.'' (Civ. Code, § 3523.) That aphorism ''can obviously have no application to any but legal wrongs or those wrongs for which the law authorizes or sanctions redress.'' (*Finch* v. *Western Nat. Bank* (1914) 24 Cal. App. 331, 338 [141 P. 261].) But to say that ''For every wrong for which the law authorizes or sanctions redress there is a remedy'' is merely to iterate a meaningless tautology, and we are not further advanced. Nor should this fact trouble us, for ''If we keep in mind that justice exists only when it is effectively administered, we may be more comfortable in admitting that it is impossible to provide a remedy for every 'wrong.' Efforts to so provide, as well as efforts to justify the denial of a remedy while trying to uphold the principle that a remedy exists for every wrong,

cloud the image of the law with trivial distinctions and hair-splitting that confound philosophers, let alone the public." (Proehl, *Anguish of Mind* (1961) 56 Nw.U.L.Rev. 477, 495.)

If the problem is to be solved on a true axiological basis, we must consider the roots of liability for negligence. ■ First, in ruling on a general demurrer or motion for nonsuit the dispositive issue ordinarily is—as it is here— that of duty; i.e., "the existence of *a duty of care owed* by the alleged wrongdoer *to the person injured,* or to a class of which he is a member." (Italics added.) (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 63 [3] [271 P.2d 23], quoting from *Routh* v. *Quinn* (1942) 20 Cal.2d 488, 491 [2] [127 P.2d 1, 149 A.L.R. 215]; accord, *Jones* v. *Czapkay* (1960) 182 Cal.App.2d 192, 201 [6] [6 Cal.Rptr. 182]; Rest., Torts, § 281, comments b to g.) If the plaintiff does not and cannot show such a duty owed directly to her, the action must be dismissed. In terms of the case at bench, "The problem must be approached at the outset from the viewpoint of the duty of defendant and the right of plaintiff, and not from the viewpoint of proximate cause. The right of the mother to recover must be based, first, upon the establishment of a duty on the part of defendant so to conduct herself with respect to the child as not to subject the mother to an unreasonable risk of shock or fright, and, second, upon the recognition of a legally protected right or interest on the part of the mother to be free from shock or fright occasioned by the peril of her child." (*Waube* v. *Warrington* (1935), *supra,* 216 Wis. 603 [258 N.W. 497-498 [1]]; accord, *Resavage* v. *Davies* (1952), *supra,* 199 Md. 479 [86 A.2d 879, 881 [2]]; *Cote* v. *Litawa* (1950) 96 N.H. 174 [71 A.2d 792, 794-795 [5], 18 A.L.R.2d 216]; *Angst* v. *Great Northern Ry. Co.* (D.C. Minn. 1955), *supra,* 131 F.Supp. 156, 159 [1-4]; *King* v. *Phillips, supra,* [1953] 1 Q.B. 429, 433.)

■ The determination of this question—the existence of a duty owed to the plaintiff by the defendant—is in the first instance for the court, not for the jury. The classic statement is that of Minturn, J., in *Morril* v. *Morril* (1928) 104 N.J.L. 557 [142 A. 337, 339-340 [8-9], 60 A.L.R. 102]: "Hence it becomes imperative before legal liability for conceded damages can be imposed upon a defendant, for the court in the first instance to inquire and determine the character of duty which the law under the facts imposed upon the defendant as the basis of liability; for manifestly, it cannot be conceded that the jury from their inner consciousness

may evolve in every variety of tortfeasance a legal duty as the standard of liability.'' (Accord, Rest., Torts, § 453; Prosser, Torts (2d ed. 1955) p. 281; Green, *The Causal Relation Issue in Negligence Law* (1962) 60 Mich. L.Rev. 543, 562-563.) Much confusion has been engendered in this connection by a misplaced reliance on the ''foreseeability'' formula. It is not enough to say that duty has often been defined in terms of ''foreseeability,'' that reasonable minds might differ as to whether the injury in the present case was ''foreseeable,'' and hence that the duty issue was here a question of fact that should have been submitted to the jury. As this court pointed out in *Richards* v. *Stanley* (1954), *supra*, 43 Cal.2d 60, 66 [8], ''Necessarily involved in submitting the case to the jury, however, is a preliminary determination [i.e., to be made by the court] that, granted a foreseeable risk, a duty arises. . . . [*T*]*here are many situations involving foreseeable risks where there is no duty.*'' (Italics added.) We then (in addition to referring to *Routh* v. *Quinn* (1942), *supra*, 20 Cal.2d 488) discussed *Lane* v. *Bing* (1927) 202 Cal. 590 [262 P. 318], and *Goodman* v. *Harris* (1953) 40 Cal.2d 254 [253 P.2d 447], and concluded (at p. 67 [8] of 43 Cal. 2d), ''Although in both of the foregoing situations it would be difficult to say that reasonable minds could not differ as to whether or not a duty should be imposed, *the question was one of law for the court, and not for the jury, to decide.*'' (Italics added.)

. There are sound reasons for the established rule that the determination of the existence and scope of the defendant's duty to the plaintiff is primarily a question for the court and does not depend only on ''foreseeability.'' First, it will be observed that the negligence issue, i.e., the *violation* of duty, is submitted to the jury under instructions couched in terms of how an ordinarily prudent person would view the ''foreseeability of risk'' created by the defendant's conduct; yet if the issue of the *existence* of duty is also submitted to the jury under a ''foreseeability'' formula, the jury will in effect be asked to determine two distinct issues in the case by means of the same ''test.'' And if, as sometimes occurs, the jury are also instructed that the defendant's conduct is not the ''proximate cause'' of events that he could not reasonably have anticipated, then truly ''analysis has played itself false, so that a case is seemingly to be subjected thrice to the ponderous process of the 'foreseeability' formula'' (Green, *The Duty Problem in Negligence Cases I*

(1928) 28 Colum. L.Rev. 1014, 1029). Confronted with repetitions of the same phrase as constituting a rule to guide them in resolving various issues, the jury may well become bewildered, take refuge in the terms of their own experience, and simply deliver a verdict according to their liking. It has been accurately said that "Foreseeability of risk . . . carries only an illusion of certainty in defining the consequences for which the defendant will be liable." (Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev. 1, 19.) For meaningful assistance the jurors need a definition, so far as relevant, of the ultimate factual conclusions upon which, if found, the law either gives the plaintiff a right to recover or the defendant a right of exoneration.

This leads to consideration of the second reason for the above mentioned established rule governing determination of the existence and scope of the defendant's duty to the plaintiff. This second reason touches on the fundamental responsibility of the court to declare the law. There is a legal duty on any given set of facts *only if the court or the Legislature says there is a duty.* "Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question [italics deleted]. . . . The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none." (*Klassa* v. *Milwaukee Gas Light Co.* (1956), *supra,* 273 Wis. 347 [77 N.W.2d 397, 402 [1]], quoting from Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev. 1, 15.) The inquiry, then, should be concentrated on the various factors which are incorporated in the court's conclusion that on the relevant set of facts there is or is not a "duty." While an all-inclusive enumeration is manifestly impossible, we have on occasion undertaken to list at least some of these factors.

Thus, in a recent case raising the question of liability to a beneficiary for a negligently drawn will (*Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [1] [320 P.2d 16, 65 A.L.R. 2d 1358]), we said: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between

the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.'' (Accord, *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [1] [15 Cal.Rptr. 821, 364 P.2d 685].)

It bears emphasis that ''foreseeability of harm'' is but one of the half dozen relevant factors mentioned in the just quoted passage from *Biakanja*. Nor is it the most important; indeed, in all save the most obvious of cases a harm is ''foreseeable'' only if, in the final analysis, a court or jury says that it is. As we have seen, the virtually unanimous opinion of the courts that have ruled on the question is that the type of harm allegedly suffered by plaintiff in the case at bench is *not* reasonably foreseeable. Some nonjudicial commentators have agreed with the courts in this respect, while others have disagreed; but the question is largely semantic, and any such debate tends to sterility. Moreover, as noted hereinabove, even ''granted a foreseeable risk,'' the court must still determine whether or not from the given factual base ''a duty arises.'' (*Richards* v. *Stanley* (1954), *supra*, 43 Cal.2d 60, 66 [8].)[8]

▆ Turning to the factors that are to be weighed in the balance we consider, on the one hand, plaintiff's undoubted interest in freedom from invasion of her bodily security, and on the other, such factors as the following:

*The Administrative Factor.* Justice, we observed above, exists only when it can be effectively administered. It was no doubt this fundamental precept that was in the mind of the court in *Waube* v. *Warrington* (1935), *supra*, 216 Wis. 603 [258 N.W. 497, 501 [2-4]], when it stated that, in circumstances such as those here shown, to impose liability would

---

[8]Recognition of this reality disposes of the argument, advanced by amici curiae, that the general rule of nonliability in the situation now before us should be abandoned in order to achieve ''consistency'' with the so-called ''rescuer'' cases (e.g., *Henshaw* v. *Belyea* (1934) 220 Cal. 458, 469 [2] [31 P.2d 348]; *Hymes* v. *Pollock* (1952) 108 Cal.App.2d 536, 538 [2] [238 P.2d 1056]). As Professor Fleming accurately observes, ''The divergent judicial approach can be explained only on the basis that, far from foreseeability being the true determinant of duty, there are weighty policy considerations which, in the one case, militate in favour and, in the other, against the plaintiff's claim to legal protection. Behind the ambivalence of the foreseeability formula, there lies the desire, on the one hand, to encourage altruistic action and, on the other, a decided hesitation based on administrative grounds to permit recovery for injury to the nervous system. Hence, no true analogy is offered by decisions from one group of cases which could be of assistance in the solution of a problem falling within the other.'' (Fleming, Torts (1957) p. 179.)

. Nor are the ''prenatal injury'' cases relevant here, for in California their foundation is statutory. (Civ. Code, § 29; see *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [92 P.2d 678, 93 P.2d 562].)

"open the way to fraudulent claims, and enter a field that has no sensible or just stopping point." It has become almost trite for legal writers to deprecate such reasoning; and we have not hesitated to reject it when we deemed that the problems of proof could be solved and the scope of liability could be delineated. (See, e.g., *State Rubbish etc. Assn.* v. *Siliznoff* (1952), *supra*, 38 Cal.2d 330, 338 [2-3].) But is this necessarily true of the case at bench?[9] To begin with the problem of proof, it is to be observed that in *Siliznoff* we were dealing with the *intentional* infliction of fright; we reasoned (*id.* at p. 338 [2] of 38 Cal.2d) that "The jury is ordinarily in a better position, however, to determine whether outrageous conduct results in mental distress than whether that distress in turn results in physical injury. From their own experience jurors are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct, but a difficult medical question is presented when it must be determined if emotional distress resulted in physical injury. (See Smith, *Relation of Emotions to Injury and Disease*, 30 Va.L.Rev. 193, 303-306.)" Here that "difficult medical question" cannot be so easily avoided. In the cited article (at pp. 281-285 of 30 Va.L.Rev.) Dr. Smith reports on his study of 301 cases involving injuries allegedly caused by psychic stimuli, and concludes (1) that "a majority of persons claiming injury from psychic causes possessed sub-normal resistance to such stimuli"; (2) that "In only 55 of the 301 cases surveyed could we say actual causation was proved by a preponderance of substantial and credible evidence"; and (3) that hence "The skeptical courts were . . . correct in doubting whether adequate criteria of proof existed in this field to make administration of a remedy feasible. Law, in a commendable desire to be forward looking, outran scientific standards. Taking all cases decided between 1850 and 1944 [the date of publication of the subject article], the net balance of justice would have been greater had all courts denied damages for injury imputed to psychic stimuli alone." (*Id.* at p. 285.)

Granted that simply because "naivete about the problem of

---

[9]The difficulties are at least recognized in James, *Scope of Duty in Negligence Cases* (1953) 47 Nw. U.L.Rev. 778, 792: "The repudiation of the impact rule, however, has not solved all problems nor ended all limitations. *Many of the problems it was aimed at were real enough.* In addition to the danger of false claims, the fact looms large that in many of these cases there would be no substantial injury to the vast majority of men." (Italics added.) The latter factor is more fully discussed *post*.

proof has caused injustice in times past does not necessarily settle the matter for the future" (*ibid.*), we are left with the question of whether in this area of inquiry where emotions play so large a role the law has now become sufficiently responsive to scientific reality to redress the "net balance of justice." The question is a disturbing one, and cannot be answered merely by invoking the rule that a conflict of expert testimony is for the jury. It must be recognized "that 'conflict of expert testimony' at trial is no guarantee that the evidence is scientifically sufficient to support a verdict." (*Id.* at p .284.) Yet the parade of expert medical witnesses continues, ushered in by both plaintiff and defendant, and the juries are daily called upon to "resolve" the disputes thus engendered. This may be difficult enough when traumatic injuries to the body are involved; but as doctors well know, the "resolution" of such conflicts often borders on fancy when the causation of alleged psychoneural disorders is at issue. There are indications, moreover, that in this area the law continues to cling to cherished preconceptions of the layman, with bland disregard for the development of modern medical knowledge. Much timeliness remains in Dr. Smith's warning (*id.* at p. 212 of 30 Va.L.Rev.) that "eagerness to be progressive may cause extravagant credulity and injury to scientific standards of proof." Extravagant credulity, of course, means ultimate injustice.

Another—and no less important—administrative factor to be weighed is the problem of setting some limits to such liability for fright or shock allegedly caused by the apprehension of danger or injury not to the plaintiff but to a third person. Here, at least, the legal writers are generally agreed that the problem is a real one. Professor Prosser suggests the following limitations on liability (Prosser, Torts (2d ed. 1955) p. 182): First, "It is clear that the injury threatened or inflicted upon the third person must be a serious one, of a nature to cause severe shock to the plaintiff, and that the shock must result in actual physical harm." But what if the plaintiff was honestly mistaken in believing the third person to be in danger or to be seriously injured? And as we are dealing here with a *negligently* caused danger or injury to the third person, what if the latter was contributively negligent? Or assumed the risk involved? Second, "The action might well be confined to members of the immediate family, or perhaps to husband, wife, parent or child, to the exclusion of by-standers, and remote relatives." But what if the third per-

son was the plaintiff's beloved niece or nephew, grandparent, fiancé, or lifelong friend, as dear to the plaintiff as her more immediate family? Third, "the plaintiff must be present at the time of the accident, or at least the shock must be fairly contemporaneous with it, rather than follow at a later date." But how soon is "fairly contemporaneous"? What is the magic in the plaintiff's being "present"? Is the shock any less immediate if the mother does not know of the accident until the injured child is brought home? And what if the plaintiff is present at the scene but is nevertheless unaware of the danger or injury to the third person until shortly after the accident has occurred (see, e.g., *Kelly* v. *Fretz* (1937) 19 Cal.App.2d 356 [65 P.2d 914])?

As Professor Prosser concedes, such limitations are quite arbitrary. If it were only a matter of logic we might well agree with Atkin, L.J., who found it "difficult to explain why the duty was confined to the case of parent or guardian and child, and did not extend to other relations of life also involving intimate associations; and why it did not eventually extend to bystanders." (*Hambrook* v. *Stokes Bros.*, *supra*, [1925] 1 K.B. 141, 158-159.) But compelling moral and socio-economic reasons, hereinafter discussed, require that a negligent defendant's liability have some stopping point. None has yet been proposed that would be fair to all parties concerned, and the failings of the above quoted limitations suggest that the quest may be an inherently fruitless one. There is an appealing simplicity in the view that difficulties in delimiting an area of liability do not justify a refusal to enter that area. But this court does not act in a vacuum; we cannot fashion a rule for the case at bench without reflecting on the fact that there will be other such cases, other plaintiffs. When, as here, a wholly new type of liability is envisioned, our responsibility extends far beyond the particular plaintiff before us, and touches society at large.

*The Socio-Economic and Moral Factors.* As just observed, there must be some stopping point to the liability of the negligent defendant. "It is still unthinkable that any one shall be liable to the end of time for all of the results that follow. in endless sequence from his single act. Causation cannot be the answer; in a very real sense the consequences of an act go forward to eternity, and back to the beginning of the world." (Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev. 1, 24.) There are two principal reasons why this is "unthinkable."

First, to the extent that the law intervenes in any area of human activity and declares that for certain consequences of that activity the actor shall be held civilly liable in damages, both the individual actor and society as a whole feel the effects of the restraint—a psychological effect in the form of a lessening of incentive, and an economic effect in the form of the cost of insurance necessary to enable the activity to continue. Yet it is recognized that no activity could survive an unlimited progression of such effects. Accordingly, when the general social utility of an activity is deemed to outweigh the particular interests with which it may clash, important policy reasons dictate that some limits be set to liability for its consequences. How do these considerations affect our problem? The law, both in California and in the many other jurisdictions which have passed on the question, now provides, as has been shown, that an actor who is merely negligent is not liable to one who claims injury through fright or shock induced by conduct directed not to the latter but to a third person. Thus, in cases where the defendant's conduct involved negligent driving of a motor vehicle the courts conclude that to extend liability to spectators who were not themselves in danger "would, in our opinion, place an unreasonable burden upon users of highways." (*Cote* v. *Litawa* (1950), *supra*, 96 N.H. 174 [71 A.2d 792, 795 [6], 18 A.L.R.2d 216] ; accord, *Resavage* v. *Davies* (1952), *supra*, 199 Md. 479 [86 A.2d 879, 883 [3-5]] ; *Waube* v. *Warrington* (1935), *supra*, 216 Wis. 603 [258 N.W. 497, 501 [2-4]].) As the industrial society in which we live becomes still more complex and the use of the streets and highways and airways increases, a certain percentage of accidents therefrom appears to become statistically inevitable. There will be losses, and our present system of insurance attempts to compensate for them, and, of course, to spread the cost of compensation over those who do not, as well as those who do, cause such losses. But could that system—imperfect at best—adequately and fairly absorb the far-reaching extension of liability that would follow from judicial abrogation of the rule now before us? And what of the many other activities of everyday life that are either uninsurable or customarily uninsured, yet may well give rise to the type of "spectator injury" here alleged? We conclude, rather, that the social utility of such activities outweighs the somewhat speculative interest of individuals to be free from the risk of the type of injury here alleged.

The second reason for seeking a stopping point to the negli-

gent defendant's liability is a related one. As long as our system of compensation is based on the concept of fault, we must also weigh "the moral blame attached to the defendant's conduct" (*Biakanja* v. *Irving* (1958), *supra,* 49 Cal.2d 647, 650 [1]). Here is felt the difference between the social importance of conduct that negligently causes harm and conduct that is intended to do so. It is often said that in the latter case the defendant will be held liable for a broader range of consequences because, as the consequences are intended, they are the more "foreseeable." But in many intentional tort cases the defendant has been held liable under this reasoning for consequences far beyond those which he actually intended. (See Bauer, *The Degree of Moral Fault as Affecting Defendant's Liability* (1933) 81 U.Pa.L.Rev. 586, 588-592.) It follows that, once more, "foreseeability" is not the real answer. Rather, the increased liability imposed on an intentional wrongdoer appears to reflect the psychological fact that solicitude for the interests of the actor weighs less in the balance as his moral guilt increases and the social utility of his conduct diminishes.

There is good sense in the conclusion of the Wisconsin court that "the liability imposed by such a doctrine is wholly out of proportion to the culpability of the negligent tort-feasor." (*Waube* v. *Warrington* (1953), *supra,* 216 Wis. 603 [258 N.W. 497, 501 [2-4]].) It begs the question to argue that "If the loss is out of all proportion to the defendant's fault, it can be no less out of proportion to the plaintiff's innocence." (Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev. 1, 17.) That obvious truism could be urged by every person who might adversely feel some lingering effect of the defendant's conduct, and we would then be thrown back into the fantastic realm of infinite liability.

Having weighed each of the foregoing factors in the balance, we hold that the complaint fails to state facts sufficient to constitute a cause of action.

The judgment is affirmed.

Traynor, J., McComb, J., and White, J.,* concurred.

PETERS, J.—I dissent.

The majority opinion states the issue to be "whether liability may be predicated on fright or nervous shock (with con-

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.

sequent bodily illness) induced solely by the plaintiff's apprehension of negligently caused danger or injury to a third person.'' So stated, the answer to such a broad question might well be in the negative. But the issue now before us is not the one quoted above. The real issue is a much more limited one. The plaintiff is not just anyone. She is a *mother* of a 17-month-old *infant child*. The defendant, *in the presence of the mother*, negligently ran down and injured that *infant child*. As a proximate result the mother has suffered permanent injuries. Thus the real question is not the one stated by the majority, but is whether or not a mother may recover damages for physical injuries resulting from emotional shock caused by fear for her infant child who is negligently run down by the automobile of the defendant in the presence of the mother. I submit that the answer to that question, so limited, should be that liability for such injuries should exist.

The italicized words above create real limitations that are not merely matters of form. Common sense tells us that a defendant who negligently injures someone, should not be liable to every oversensitive person, whoever he or she may be, who is shocked by an accident, whether it happens in his or her presence or not, and happens to any person, whomsoever he or she may be, and whether plaintiff is related to or even known to the injured person or not. The line of legal causation cannot be stretched so thin. But the fact that, morally and legally, there should not be liability in any such general situation is no reason for holding that, morally and legally, there should not be liability in the limited situation. Now common sense tells us, and elementary principles of fairness command us, to impose liability against a negligent defendant who negligently injures an infant child in the presence of its mother, and the mother suffers serious emotional shock as a result. Admittedly, if we once create liability in the limited situation here involved, demands will inevitably be made upon us to extend the limits of the rule. Admittedly, it will be a difficult but not impossible task to draw the line between liability and nonliability in such situations. When we are called upon to draw that line the place we draw it may not, perhaps, be entirely logical. By necessity it will have to be arbitrary. It will be less arbitrary, however, than to deny liability entirely. But the fact that such a task may be difficult should not deter us from performing it. One of the main functions of appellate courts is to draw just such lines.

We are constantly doing so. The law grows, develops, expands or is limited by a case by case consideration of particular facts, and not by deciding broad general principles not involved in the case under consideration. All that we are required to decide in the instant case, and it is submitted all we should decide, is whether a mother, who as a result of seeing her infant child run down by defendant's truck, suffers severe shock may recover. Whether anyone else, in a different relationship, can recover, should be left for future cases.

It must be conceded, as the majority opinion correctly points out, that the great weight of case authority denies liability even in the limited situation here involved. This is partly due to the sheer inertia caused by the doctrine of stare decisis, and the apparent reluctance of appellate courts to disturb the status quo. It is also in no small part due to the fear, expressed in many of the cases that have adopted the majority rule, that it will be difficult if not impossible to draw the line between liability and nonliability in such cases. This point has already been discussed. So far as the doctrine of stare decisis is concerned, it is, of course, a sound doctrine, but it is not immutable. Old cases, no matter how numerous, should not stand, if, under modern and different conditions, they cannot withstand the impact of critical analysis. The doctrine of stare decisis should never be used as a substitute for such critical analysis. If an old rule cannot withstand such analysis it should be overruled. This court has not hesitated to do so in other situations. It should not hesitate here. It seems obvious to me that anyone who objectively analyzes the problem will inevitably come to the conclusion that it is reasonably probable that a mother who observes her child being run over by a negligently operated truck will inevitably be shocked, and it is also reasonably probable that the effects of such shock may inflict serious and permanent injuries. To use the language of the cases, such result is "reasonably probable" and "reasonably foreseeable." The negligence of defendant is, obviously, the direct "proximate cause" of the accident. The resulting injuries should therefore be compensable. In such a situation the fundamental maxim that "for every wrong there is a remedy" contained in section 3523 of the Civil Code (referred to by the majority as a mere "aphorism") takes on real legal and important significance. The mandate of section 1714 of the Civil Code that: "Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want

of ordinary care or skill in the management of his property or person," then becomes applicable.

It should be pointed out that the California law is not as clearly established as the majority opinion implies. The majority opinion does state that this court has not yet passed on the question, and that it has, on three occasions, expressly refused to pass on the issue. (*Easton* v. *United Trade School Contr. Co.*, 173 Cal. 199, 202 [159 P. 597, L.R.A. 1916A 394]; *Lindley* v. *Knowlton*, 179 Cal. 298, 301 [176 P. 440]; *Webb* v. *Francis J. Lewald Coal Co.*, 214 Cal. 182, 184 [4 P.2d 532, 77 A.L.R. 675].) The majority opinion places its main reliance in establishing the California law on two appellate court opinions, *Clough* v. *Steen*, 3 Cal.App.2d 392 [39 P.2d 889], and *Reed* v. *Moore*, 156 Cal.App.2d 43 [319 P.2d 80].

No petition for hearing was filed in the *Clough* case. It was a decision that was probably wrong under existing California law. There a mother was injured and her child killed in an accident. In her action, as part of her damages, the mother recovered for her personal injuries and for shock and its results from seeing her child killed before her eyes. The appellate court reversed the plaintiff's verdict, holding that this last-mentioned item was not recoverable. Whatever may be the rule as to recovery for shock when the mother is not injured or not in the zone of danger, there is substantial authority to the effect that, if the mother is injured or in the zone of danger, damages caused by shock in seeing her child injured or killed may be included in the award. That is certainly the law in this state. (*Easton* v. *United Trade School Contr. Co., supra,* 173 Cal. 199; see also cases collected and commented on in Prosser on Torts (2d ed. 1955) p. 181.)

The main case relied upon by the majority as establishing "existing law" in California is *Reed* v. *Moore, supra,* 156 Cal.App.2d 43. That case presents a factual situation very close[1] to the instant one, and undoubtedly held that no liability existed under such facts. In reaching this result the appellate court quoted the rule of nonliability as set forth in the legal encyclopedias and placed great reliance on *Clough* v. *Steen, supra,* 3 Cal.App.2d 392, a case, as already pointed out, that was probably wrong. It is worthy of note that upon petition for hearing to this court in the *Reed* case the petition

[1]It should be noted that in the *Reed* case a wife was claiming damages for shock caused by seeing her husband injured, and not an infant child. Whether this creates a ground for distinction should be left for future cases.

was denied by a four to three vote. While it may be true that a denial of a hearing, as stated in the majority opinion, gives some added weight to the appellate court opinion, a denial by a four to three vote indicates that on the day of that vote (February 5, 1958) three justices of this court had serious doubts about the correctness of the appellate court opinion. This, coupled with the express reservation by this court in the three cases mentioned above, makes the *Reed* case a pretty weak "reed" upon which to rely as "establishing" California law.

There are other matters of principle to which reference should be made. The early law was to the effect that shock was not a recoverable item of damage. That rule had the advantage, at least, of being clear, easily understood and easy to apply. Then many states, including California, started to limit that rule by holding that shock accompanied by impact was a proper element of damage (see cases cited in majority opinion). The rule was further limited by the rule, now the law of California, that recovery for shock may properly be an item of damage even without impact if the plaintiff is in the "zone of danger" (also see cases cited in the majority opinion). Then the rule was further limited, if not abolished, by the several California cases holding that a plaintiff could recover for shock caused by the infliction of an intentional tort on a third person member of the family, even though the plaintiff was not in the "zone of danger." (These cases are collected and cited in the majority opinion.)

These gradual modifications of the original rule are of great significance. They at least suggest, if they do not compel, the conclusion that we have now reached the stage of development of the law that we should at long last take the intelligent and logical step forward of holding that a mother who sees her child run down by a negligent defendant, and who, as a proximate result thereof, suffers serious and permanent injuries should recover whether or not she was in the "zone of danger." The "zone of danger" test is illogical and unsound and should be abandoned.

It seems to me that when this court adopted the rule that in the case of an intentional tort committed against a member of the family, the plaintiff can recover for shock resulting in serious injuries whether she was in the "zone of danger" or not it necessarily undermined the rule that no such recovery should be allowed in the case of negligent torts. Just a few months ago this court expressly held that "insofar as inter-

spousal liability for tort is concerned there is no logical or legal reason for drawing a distinction between'' intentional and negligent torts (*Klein* v. *Klein*, 58 Cal.2d 692, 693 [26 Cal.Rptr. 102, 376 P.2d 70]). That was a five to two decision in which the author of the majority opinion in the instant case dissented, mainly on the ground that there was a real and legal distinction between the two. The majority opinion in the instant case, by necessary implication, overrules the *Klein* case in this respect.

The intentional tort cases are important for another reason. The line between liability and nonliability in the intentional tort cases, that is who may sue for shock because they saw injuries to whom, is precisely the same as it is in the negligent tort cases. It is no more difficult to draw that line in the negligent tort cases than it is in the intentional tort cases. Yet the difficulty of drawing that line in the intentional tort cases did not deter this court from imposing liability, and adopting the modern, intelligent, logical, and humane rule of liability in this field. It should not be a deterrent in this, a negligent tort case.

It would serve no useful purpose to further analyze the problem here involved. This was ably and intelligently done by the District Court of Appeal, First Appellate District, Division One, when this case was before it for consideration. The unanimous opinion of that court, written by Justice Tobriner, then a member of that court, adequately discusses and disposes of the problem. I therefore adopt, as part of my dissent, the following portions[2] of the opinion of the District Court of Appeal appearing in (Cal.App.) 23 Cal.Rptr. 131:

''We probe here the single question whether a mother may recover damages for physical injuries resulting from emotional shock caused by fear for the safety of her infant child. While the cases are divided upon the issue, we cannot rule that the negligent driver owes no 'duty' to the injured mother and thus avoids liability. As we shall point out, we cannot hold as a matter of law that the risk of such injury is not foreseeable in the context of present-day conditions.

'' . . . . . . . . . . .

''Whatever natural and human impulse there may be to allow recovery to a plaintiff mother in this situation, the decisions reflect neither magnanimity nor uniformity in grant-

---

[2]The only part of that opinion omitted is the statement of facts, which adequately appears in the majority opinion herein and need not be repeated.

ing relief. We certainly agree with Prosser's statement: 'It seems sufficiently obvious that the shock of a mother at danger or harm to her child may be both a real and a serious injury. All ordinary human feelings are in favor of her action against the negligent defendant.' (Prosser, Law of Torts (2d ed. 1955) p. 181.) To understand the reluctance of some courts to give effect to that feeling we must glance backwards briefly to certain aspects of the development of the law of torts.

"In the early stages of that unfolding, the courts, following an approach that is the very antithesis of the reasoning which denied recovery in our case,[1] fastened a strict liability upon the actor who caused the damage. In the decisions, which set the rules of conduct for the enclosed feudal society, the actor bore responsibility for the damage he caused without regard to whether he was at fault or whether he owed a 'duty' to the injured person. Indeed, the defendant owed a duty to all the world to conduct himself without causing injury to his fellows. It may be that the physical contraction of the feudal society imposed an imperative for maximum procurable safety, and a corresponding absolute responsibility upon its members.

"The Industrial Revolution, which cracked the solidity of the feudal society and opened up wide and new areas of expansion, changed the legal concepts. Just as the new competitiveness in the economic sphere figuratively broke out of the walls of the feudal community, so it broke through the rule of strict liability. In the place of strict liability it introduced the theory that an action for negligence would lie only if the defendant breached a duty which he owed to plaintiff. As Lord Esher said in *Le Lievre* v. *Gould* [1893] 1 Q.B. 491, 497: 'A man is entitled to be as negligent as he pleases towards the whole world if he owes no duty to them.' The evolution of this concept of 'duty' proved to be a tortuous one, a course which has been marked by courts that have disagreed and decisions that have been vague. Indeed, Prosser has written that ' "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is

[1] Pound, The Spirit of the Common Law, pp. 27-31; 119-120; Wigmore, *Responsibility for Tortious Acts: Its History* (1894) 7 Harv. L. Rev. 315, 383, 441; Ames, *Law and Morals* (1908) 22 Harv. L. Rev. 97; 3 Holdsworth, History of English Law (3d ed. 1923) pp. 375-377; 8 Holdsworth, History of English Law (3d ed. 1923) pp. 446-459."

entitled to protection.' (P. 167.) Whatever its content, however, the concept of duty lies deeply rooted in the cases, and our task requires us to determine if we can properly say respondents owe one to appellant here.

"The classic definition of duty has been in terms of fore-seeability, but the definition itself is wide and general, and its application here becomes even more difficult because of the incursion of two other factors: the so-called 'unforesee-able' plaintiff and the infliction upon such plaintiff of emo-tional distress. As to the definition, one statement of it occurs in the famous case of *Donoghue* v. *Stevenson* [1932] A.C. 562, 580: 'The rule that you are to love your neighbour becomes in law, you must not injure your neighbour; and the lawyer's question, Who is my neighbour? receives a re-stricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be like-ly to injure your neighbour. Who, then, in law is my neigh-bour? The answer seems to be—persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question.'

"But our question is the more difficult because we must determine if appellant is a person who is 'closely and di-rectly affected' by the act of the driver of the truck that he should have reasonably had her in contemplation when he directed his mind to performing the act. Respondents would contend here that the mother of the injured child, should, instead, be characterized as an 'unforeseeable' victim of the driver's negligence and outside the zone of any appar-ent danger. She would fall within the exclusion of *Palsgraf* v. *Long Island R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253], a leading case in which the court denied li-ability against a railroad, whose agent, assisting a passenger to board a train, dislodged a package of fireworks which exploded, causing some scales, many feet away, to fall upon plaintiff. The court held that defendant owed no duty to this 'unforeseeable' plaintiff. Indeed, our case compounds the *Palsgraf* difficulty because the injury to plaintiff consist-ed of emotional distress, a type of harm which the courts have been reluctant to recognize.[2]

"[2]The general reluctance to grant relief for emotional distress is demonstrated in cases cited in Prosser, Law of Torts (2d ed. 1955) p. 38; Magruder, *Mental Disturbance in Torts*, 49 Harv. L. Rev. 1033,

"We believe, however, that the proper approach is to recognize, and grant, recovery for an injury caused to one who suffers emotional distress. We think, too, that such injury is foreseeable if a defendant's conduct encompasses potential risk of harm to a class of persons which includes the plaintiff. Harper and James point out that this foreseeable risk may be of two types. The first class involves actual physical impact. 'In other cases, however, plaintiff is outside the zone of physical risk (or there is no risk of physical impact at all), but bodily injury or sickness is brought on by emotional disturbance which in turn is caused by defendant's conduct. Under general principles recovery should be had in such a case if defendant should foresee fright or shock severe enough to cause substantial injury in a person normally constituted. Plaintiff would then be within the zone of risk in very much the same way as are plaintiffs to whom danger is extended by acts of third persons, or forces of nature, or their own responses (where these things are foreseeable).' (2 Harper & James, The Law of Torts, pp. 1035-1036; footnotes omitted.)

"Prosser states the following rule: 'In negligence cases, duty is an obligation, recognized by the law, to conform to a particular standard of conduct toward another. The plaintiff must be within the class of persons to whom the duty is owed, and no action may be founded upon a duty only to others.' (P. 166.)

"The point in controversy crystallizes into the issue as to who falls within the class of persons to whom respondents owed a duty. Several dangers were present when the driver negligently operated respondent ice company's truck in the vicinity of the mother and her child. There was the danger that certain persons, including the child, and possibly the mother, although she did not fear for her own safety, might be struck by the truck. There was the danger that property might be destroyed. There was the danger that certain persons might suffer physical harm as a result of fright for their own safety or for the safety of others. The foreseeability of each of these dangers constitutes a question of fact which, within the limits we set forth *infra*, should be resolved by the trier of fact and not by a mechanical rule which, insensitive

1035; N. Y. Law Rev. Comm. Report (1936), Recommendation of the Law Revision Commission to the Legislature, Relating to Liability for Injuries Resulting from Fright or Shock, pp. 379, 410-422."

to individual situations, serves merely to establish an artificial and abstract simplicity.

"We cannot rule that, as a matter of law, the injury to appellant was not foreseeable. The only justification for holding that appellant cannot state a cause of action would be, not that the injury to her, due to emotional distress, was not foreseeable, as a matter of law, but rather that the courts must deny recovery for reasons of policy; that, otherwise, factual questions will arise which are too difficult for courts or juries to decide.[3]

"Thus, the basic precept that 'It is fundamental to our common-law system that one may seek redress for every substantial wrong' (*Battalla* v. *State* (1961) 10 N.Y.2d 237 [176 N.E.2d 729, 730]) becomes blocked out in many cases by legalistic abstractions. Depicting the situation in obscure colorization various courts declare themselves unable to give relief because of the absence of such requirements as (1) *physical* impact, (2) presence of the *plaintiff* in the zone of physical impact, (3) physical *manifestations* of emotional distress, or (4) plaintiff's fear for *his own* safety. Finally, (5) some courts hold that recovery would encourage a flood of fraudulent claims which, they say, they cannot successfully segregate from deserving ones. While at the base of these contentions they may be no more than an underlying reluctance to permit recovery in a new area of injury, the considerations should be examined on the merits.

"Thus no immutable rule calls for physical impact to justify recovery for emotional distress.[4] The courts have long

---

"[3]As the Reporter of Tentative Draft No. 5 of § 313 of the Restatement of the Law of Torts 2d points out: 'Most of the decisions denying recovery have said that there is no duty to the plaintiff on the *Palsgraf* theory, because no harm to the plaintiff was reasonably to be foreseen. This sounds unreasonable; if a small child is run down in the street, it is not at all unlikely that the mother may be somewhere in the vicinity, and suffer severe mental disturbance resulting in bodily harm. The basis of the decisions appears rather to be a distrust of the injury itself, together with the difficulty of drawing a line which will rule out remote relatives, those who discover the harm five seconds or an hour after it occurs, and the like.' (Pp. 9, 10-11.)"

"[4]The following cases dispense with the impact requirement in actions for negligent infliction of emotional distress: *Battalla* v. *State* (1961) 10 N.Y.2d 237 [176 N.E.2d 729, 730]; *Padgett* v. *Colonial Wholesale Distributing Co.* (1958) 232 S.C. 593 [103 S.E.2d 265], citing *Sloane* v. *Southern Cal. Ry. Co.* (1896) 111 Cal. 668 [44 P. 320]; *Colla* v. *Mandella* (1957) 1 Wis.2d 594 [85 N.W.2d 345]; *Belt* v. *St. Louis-San Francisco Ry. Co.* (10th Cir. 1952) 195 F.2d 241, citing *Emden* v. *Vitz* (1948) 88 Cal.App.2d 313 [198 P.2d 696] and *Taylor* v. *Pole* (1940) 16 Cal.2d 668 [107 P.2d 614]; *Mahnke* v. *Moore* (1951) 197 Md. 61 [77 A.2d 923];

held that the occupant of land who suffers a trespass or nuisance may recover for emotional distress caused by fear for the safety of a member of his family. In *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328 [5 Cal.Rptr. 686, 353 P.2d 294], the Supreme Court of California said, 'regardless of whether the occupant of land has sustained physical injury, he may recover damages for the discomfort and annoyance of himself and the members of his family and for mental suffering occasioned by fear for the safety of himself and his family when such discomfort or suffering has been proximately caused by a trespass or a nuisance.' (P. 337.) Granted that the rule expressed here derives from the earlier sensitivity of the law to the rights of the property holder, no reason forbids a similar modern recognition of the individual's interest in the protection of his emotional stability.[5]

"The second asserted requirement, that the plaintiff must be present within the zone of physical impact, finds expression in the well known case of *Waube* v. *Warrington* (1935)

---

*Cote* v. *Litawa* (1950) 96 N.H. 174 [71 A.2d 792, 18 A.L.R.2d 216]; *Rasmussen* v. *Benson* (1937) 133 Neb. 449 [275 N.W. 674]; *Frazee* v. *Western Dairy Products* (1935) 182 Wash. 578 [47 P.2d 1037]; *Cashin* v. *Northern Pac. Ry. Co.* (1934) 96 Mont. 92 [28 P.2d 862]; *Bowles* v. *May* (1932) 159 Va. 419 [166 S.E. 550]; *Alabama Fuel & Iron Co.* v. *Baladoni* (1916) 15 Ala.App. 316 [73 So. 205]; *Salmi* v. *Columbia & N. R.R. Co.* (1915) 75 Ore. 200 [146 P. 819]; *Kimberly* v. *Howland* (1906) 143 N.C. 398 [55 S.E. 778]; *Purcell* v. *St. Paul City Ry. Co.* (1892) 48 Minn. 134 [50 N.W. 1034]. According to the writer of *Intentional Infliction of Mental Suffering: A New Tort in Illinois*, 11 De Paul L. Rev. 151 (Autumn-Winter 1961), reprinted in Insurance Counsel Journal (1962) vol. 29, pp. 459, 461-462: 'This rule, requiring impact in cases of negligence is followed by Illinois and by thirteen other states. However, it has been rejected in several states and abandoned by many others that had previously adopted it; so that today the majority rule is that where there is a definite physical injury produced by extreme emotional distress negligently caused, the defendant is liable notwithstanding the absence of any physical impact.' (Footnotes omitted.) "

"[5]Courts have likewise granted recovery for emotional disturbance in other situations in which the claimant has not suffered physical impact: *Sloane* v. *Southern Cal. Ry. Co.* (1896) 111 Cal. 668 [44 P. 320] (recovery for emotional suffering of female passenger wrongfully expelled from railroad car); *Emden* v. *Vitz* (1948) 88 Cal.App.2d 313, 318 [198 P.2d 696] (wrongful eviction from apartment followed by emotional disturbance); *Tate* v. *Canonica* (1960) 180 Cal.App.2d 898 [5 Cal.Rptr. 28] (conduct intended to cause emotional distress followed by suicide); 72 A.L.R. 1198, 1203 (negligent transmission of telegram); 80 A.L.R. 298, 304; 12 A.L.R. 342 (mental anguish on account of mutilation of corpse). Recovery for emotional disturbance resulting from abuse of a dead body is hardly consistent with denial of recovery for emotional distress of a mother who witnesses a child's injury or loss of life. Is the contemplation of injury to the corpse more disturbing than that of the injury which may cost a child its life?"

216 Wis. 603 [258 N.W. 497],[6] although, as we shall point out, the basic premise of the case is not free from criticism. In the Wisconsin case Mrs. Waube, watching from the safety of her own home, saw defendant operate her husband's automobile so negligently that she struck and killed Mrs. Waube's child. Denying recovery for the consequent emotional shock which caused Mrs. Waube's death, the court said: 'Fundamentally, defendant's duty was to use ordinary care to avoid physical injury to those who would be put in physical peril, as that term is commonly understood, by conduct on his part falling short of that standard. It is one thing to say that as to those who are put in peril of physical impact, impact is immaterial, if physical injury is caused by shock arising from the peril. . . . It is quite another thing to say that those who are out of the field of physical danger through impact shall have a legally protected right to be free from emotional distress occasioned by the peril of others, when that distress results in physical impairment.'

''[6]The case is discussed in Magruder, *Mental and Emotional Disturbance in the Law of Torts* (1936) 49 Harv. L. Rev. 1033, 1040. The underlying problem has given the draftsmen of the Restatement of the Law of Torts 2d considerable trouble. Thus the original Restatement provision, § 313, Restatement of the Law of Torts (1934) provides as follows: 'If the actor unintentionally causes emotional distress to another, he is liable to the other for illness or bodily harm of which the distress is a legal cause if the actor (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm. *Caveat*: The Institute expresses no opinion as to whether an actor whose conduct is negligent as involving an unreasonable risk of causing bodily harm to a child or spouse is liable for an illness or other bodily harm caused to the parent or spouse who witnesses the peril or harm of the child or spouse and thereby suffers anxiety or shock which is the legal cause of the parent's or spouse's illness or other bodily harm.' (Pp. 850-851.) In Tentative Draft No. 5, the Reporter, Professor Prosser, proposes deleting the caveat and substituting: '(2) The rule stated in subsection (1) has no application to illness or bodily harm of another, caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.' (P. 9.) The import of this change is altered, however, upon reading the reasons advanced by the Reporter: '*Note to Institute*: The Caveat is stricken, and Subsection (2) is substituted, because of the overwhelming weight of the case law. The Advisers are unanimous in wishing to retain the Caveat, for its possible effect upon the courts—although it must be conceded that it has thus far had no effect. The Reporter is in sympathy with this position, and feels that there should be liability to a mother who suffers a heart attack when she sees her child killed before her eyes. He is compelled, however, to recognize that the decisions are otherwise. The Council are agreed that the Caveat should go out, and the definite rule of nonliability should be stated.' (P. 9.)''

(Pp. 500-501 [258 N.W.].) As the Wisconsin court itself intimates,[7] and as we have said *supra,* the test of foreseeability would lead to the opposite result; the court reaches its conclusion upon the basis of the 'social interests' it envisages and 'fairness and justice.' (P. 501 [258 N.W.].) The application of these concepts strangely excludes the injury of the plaintiff and the unfairness and injustice to plaintiff of a denial of recovery. In any event, what is the significance of Mrs. Waube's presence in the danger zone if we eliminate the premise that she must entertain fear for herself?

"Moreover, the famous English case of *Hambrook* v. *Stokes Brothers* [1925] 1 K.B. 141 comes to the opposite conclusion. In *Hambrook* the defendants' servant left a truck parked at the top of a steep street with the engine running and without taking proper precautions to prevent it from moving. The truck started down the hill by itself and finally ran into the side of a house. The deceased, a pregnant woman, while walking with her children to school, saw the oncoming truck. Although, according to the court, she suffered no personal exposure to danger, she feared for the safety of her children, who had gone around a corner and were out of sight. After being informed that a little girl had been injured she discovered that the victim was her own child. Shocked by the sight of the child in the hospital, the decedent suffered a hemorrhage; ultimately both she and her unborn child died.

"The court allowed recovery to her husband even though the deceased mother neither saw the accident, feared for her own safety, nor encountered any personal danger. The court said: 'It would result in a state of the law in which a mother, shocked by fright for herself, would recover, while a mother shocked by her child being killed before her eyes, could not, and in which a mother traversing the highway with a child in her arms could recover if shocked by fright

---

"'[7]Thus the Wisconsin court states: 'The answer to this question cannot be reached solely by logic, nor is it clear that it can be entirely disposed of by a consideration of what the defendant ought reasonably to have anticipated as a consequence of his wrong. The answer must be reached by balancing the social interests involved in order to ascertain how far defendant's duty and plaintiff's right may justly and expediently be extended.' (*Waube* v. *Warrington* (1935) 216 Wis. 603 [258 N.W. 497, 501].) Cf. *Resavage* v. *Davies* (1952) 199 Md. 479 [86 A.2d 879], limiting, and in part, rejecting the earlier Maryland case of *Bowman* v. *Williams* (1933) 164 Md. 397 [165 A. 182], and citing *Waube*; but see the dissenting opinion of Judge Markell in *Resavage*."

for herself, while if she could be cross-examined into an admission that the fright was really for her child, she could not. In my opinion such distinctions would be discreditable to any system of jurisprudence in which they formed a part.' (P. 157.)[8] This case is compelling authority in the instant case, directly opposed in result, although nearly identical factually, to *Waube*.

"Turning to the third alleged requirement, we note that although some cases in other states hold that emotional distress, even if followed by physical injury, cannot serve as a basis for recovery in such a situation as the instant one,[9] neither reason nor decision in California support such a conclusion. Thus in *Easton* v. *United Trade School Con. Co.* (1916) 173 Cal. 199, 203 [159 P. 597, L.R.A. 1916A 394], the court declared: 'In no one of these cases, nor in any other well-adjudicated case—and certainly not by the courts of this state—is it held that where fright accompanies or follows a wrongful physical injury, that it is not an element of damage. To the contrary, fright under such circumstances is but one form of mental anguish, and the mental anguish as a direct reasonable outcome of the illegal physical injuries is always an element of damage.' Since the complaint in the instant case alleges that the emotional distress caused physi-

---

"[8]The court, in *King* v. *Phillips* [1953] 1 Q.B. 429, dismissed an appeal from a ruling against a plaintiff mother for recovery for shock when the plaintiff mother heard her infant son scream as a taxi driver backed into the boy on a tricycle. The boy was 'slightly hurt' and 'the tricycle was damaged.' (P. 430.) Apparently the appellate court refused to set aside as a matter of law the trial court's finding that the injury to plaintiff was not foreseeable. Singleton, L.J., stated that *Hambrook* was not overruled by the later case of *Bourhill* v. *Young* [1943] A.C. 92, and considered the instant case from the standpoint of foreseeability of the ' ''risk of injury (including injury by shock although no direct impact occurred) . . .'' ' (P. 433.) Denning, L. J., favored following *Hambrook* to the extent that it extended a duty not only to the injured child, but also to the parent, but considered the injury in the instant case as unforeseeable and distinguishable from the situation existing in *Hambrook*. Hodson, L.J., considered that *Hambrook* was not overruled by *Bourhill* solely because the defendant in *Hambrook* admitted negligence."

"[9]Cases denying recovery for emotional distress even though followed by physical manifestations: *Mitchell* v. *Rochester Ry. Co.* (1896) 151 N.Y. 107 [45 N.E. 354], overruled in *Battalla* v. *State* (1961) 10 N.Y.2d 237 [176 N.E.2d 729, 730]; cases collected in N.Y. Law Rev. Comm. Report (1936) pp. 410-422. Contra: Cases collected in N.Y. L. Rev. Comm. Report (1936) p. 406, et seq.; *Lindley* v. *Knowlton* (1918) 179 Cal. 298 [176 P. 440]; *Vargas* v. *Ruggiero* (1961) 197 Cal.App.2d 709 [17 Cal.Rptr. 568]; see *e.g.*, *Bowman* v. *Williams* (1933) 164 Md. 397 [165 A. 182]; *Mitnick* v. *Whalen Bros., Inc.* (1932) 115 Conn. 650 [163 A. 414] (plaintiff must fear for *own* safety)."

cal injury it falls within the *Easton* holding and disposes of this third possible basis for the rejection of appellant's claim.

"The fourth potential ground of rejection, that plaintiff must fear for his own safety rather than for that of another, finds expression in *Reed* v. *Moore* (1957) 156 Cal.App. 2d 43 [319 P.2d 80] and similar decisions;[10] yet some of the cases cited in *Reed*, some subsequent California cases, as we shall point out, and some cases of other states,[11] do not adopt certain of its premises. In *Reed* a pregnant woman witnessed an accident precipitated by defendant's negligence, involving an automobile occupied by plaintiff's husband. As a result plaintiff suffered emotional strain, mental shock and fright resulting in actual physical injury and a miscarriage. The court affirmed the judgment sustaining defendant's demurrer without leave to amend.

"*Reed* relies upon *Easton*, a case which, we have noted, holds that a plaintiff may recover for physical injury which follows emotional distress. *Reed* likewise rests upon *Kelly* v. *Fretz* (1937) 19 Cal.App.2d 356 [65 P.2d 914], which recognized that the authorities were in conflict upon whether or not a mother should recover for emotional shock produced by the fear of the safety of her child. In that case defendants' negligence resulted in the death of plaintiff's mother-in-law and the injury of her child. Plaintiff herself was not struck or frightened by the car's approach and had no

"[10]Other cases to the same effect: *Nuckles* v. *Tennessee Electric Power Co.* (1927) 155 Tenn. 611 [299 S.W. 775]; *Carey* v. *Pure Distributing Corp.* (1939) 133 Tex. 31 [124 S.W.2d 847]; see cases collected in 18 A.L.R.2d 220, 230-234; cases collected in N.Y. Law Rev. Comm. (1936) 451-452, fn. 265."

"[11]The court in *Bowman* v. *Williams* (1933) 164 Md. 397 [165 A. 182], refused to distinguish between fright for one's own safety and for the safety of the members of his family. In a situation in which defendant's truck, out of control, crashed into plaintiff's house, endangering plaintiff as well as his family, the court said: '[T]he effect of fright being impredictable, there is neither logic nor reason to hold, with some of the cases, that a distinction is to be taken so that, if a party suffer an injury, as loss of health, of mind, or of life, through fear of safety for self, a recovery may be had for the negligent act of another; but may not recover under similar circumstances, if the fear be of safety for another.' (P. 183.) In a later case (*Resavage* v. *Davies* (1952) 199 Md. 479 [86 A.2d 879]), the court in a three to two decision, held that a mother who suffered nervous shock and resulting physical injuries when, from her front porch, she saw her two daughters struck and killed, could not recover for her injuries. A ruling similar in substance to *Bowman* is *Alabama Fuel & Iron Co.* v. *Baladoni* (1916) 15 Ala.App. 316 [73 So. 205]. See also *Penick* v. *Mirro* (1960) 189 F.Supp. 947."

knowledge of it. Whether the verdict rested upon plaintiff's distress caused by injuries to these others, or upon the element of fright produced by fear for the safety of her child or for her own safety, did not clearly appear. The court said: 'Manifestly the verdict could not rest upon grief caused by the injuries to others. [Citations.] *If it rested upon the element of fright produced by fear for the safety of her child, the authorities differ on the right of recovery.* (*Lindley* v. *Knowlton,* 179 Cal. 298, 302 [176 P. 440].) If it rested on fear for her own safety, her evidence fails to support the verdict.' (P. 362; emphasis added.)

"As the quoted portion of the opinion discloses, the *Kelly* case relied upon *Lindley,* a decision in which the court, although not required to decide the issue, recognized that excellent authority supported recovery for fright produced by the 'apprehended danger' of another. (P. 299.) In *Lindley,* a 165-pound chimpanzee had entered plaintiff's house and attacked her children, whom she rescued from it. She may have feared for herself as well as her children but her children were exposed to the greater danger; when she intervened the chimpanzee was 'choking one of them severely; . . .' (P. 299.)

"A consideration of California cases subsequent to *Reed* brings us to the fifth and last deterrent upon which courts have relied for refusal of relief in the present type of case. Courts have said that 'to allow recovery in the absence of physical injury will open the door to unfounded claims and a flood of litigation. . . .' (*State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 338 [240 P.2d 282].) Yet the Supreme Court in *Siliznoff,* in the absence of physical manifestations, gave relief for emotional distress which followed threats of physical violence. While in that case plaintiff intentionally, rather than negligently, caused the emotional upset, the court recognized that mental distress could foreseeably lead to bodily harm. Thus the cause of action need not be 'founded on a right to be free from intentional interference with mental tranquillity, but on the right to be free from negligent interference with physical well-being.' (P. 336.)

"The court in *Siliznoff,* moreover, did not shy away from affording recovery for the bare emotional distress because it might be simulated, but held that the jurors '[f]rom their own experience' (p. 338) were competent to judge the effect of different acts upon the emotions. Indeed, in an age when

the teachings of psychiatry have made clear the effect of emotional disturbance, it would be incongruous to hold that we must not allow recovery for such injury because it is hard to measure or because it may be simulated.[12]

"The various bases for refusal of relief which we have discussed do not actually touch upon the central issue as to whether respondents owed appellant a duty of due care because of the foreseeability of the emotional trauma suffered by appellant. When one is negligent in the operation of a car he should, as a reasonable man, foresee that the class of persons who may suffer harm from his misconduct includes the parent whose emotional distress issues from the exposure of his child to injury by reason of the negligence. The above grounds for refusal of relief are in substance no more than court-inspired theories to restrict the range of liability of a defendant to narrow areas; they do not relate to the key question.

"We are sympathetic with courts which do not believe that redress should be afforded for the flutter of every heart at the sight of an accident. But the need for delineating the area of liability does not justify the obliteration of the liability. We think Prosser has suggested reasonable boundary lines; the instant case falls within them. As Prosser states: 'It is clear that the injury threatened or inflicted upon the third person must be a serious one, of a nature to cause severe shock to the plaintiff, and that the shock must result in actual physical harm. The action might well be confined to members of the immediate family, or perhaps to husband, wife, parent or child, to the exclusion of bystanders, and remote relatives. As an additional safeguard, it has been said that the plaintiff must be present at the time of the accident, or at least that the shock must be fairly contemporaneous with it, rather than follow at a later date. Admittedly such restrictions are quite arbitrary, but they

---

[12]As the court states in *Emden* v. *Vitz* (1948) 88 Cal.App.2d 313 [198 P.2d 696]: 'Appellants' contention that the rule permitting the maintenance of the action would be impractical to administer and would flood the courts with litigation is but an argument that the courts are incapable of performing their appointed tasks, a premise which has frequently been rejected.' (P. 319.) The New York Court of Appeals has recently pointed out: 'In any event, it seems that fraudulent accidents and injuries are just as easily feigned in the slight-impact cases and other exceptions wherein New York permits a recovery, as in the no-impact cases which it has heretofore shunned.' (*Battalla* v. *State* (1961) 10 N.Y.2d 237 [176 N.E.2d 729, 731]; footnotes omitted.) See Throckmorton, *Damages for Fright*, 34 Harv. L. Rev. 260-277."

may be necessary in order not to "leave the liability of a negligent defendant open to undue extension by the verdict of sympathetic juries, who under our system must define and apply any general rule to the facts of the case before them." Within some such limits, it is still possible that a rule imposing liability may ultimately be adopted.' (P. 182; footnotes omitted.)

"Within those limits the trier of the fact in the instant case may find that the emotional distress suffered by appellant was foreseeable to respondents.

"It is not consonant with the reactions, or the mores, of the society of today to hold that the mother who suffers emotional distress upon the sight of her child's injury should not recover if the trier of fact finds such injury was reasonably foreseeable. The knowledge of potential emotional trauma to a parent who witnesses an injury to a child is too clear to the negligent driver to permit an escape upon the ground of unforeseeability. In this time of death and danger on the highway, it would be anachronistic to grant immunity to the negligent driver for such foreseeable emotional disturbance upon the basis of legal abstractions that do not relate to the issue of the case."

I would reverse the judgment.

Gibson, C. J., and Peek, J., concurred.

Appellant's petition for a rehearing by the Supreme Court was denied April 9, 1963. White, J.,* participated in place of Tobriner, J., who deemed himself disqualified. Gibson, C. J., Peters, J., and Peek, J., were of the opinion that the petition should be granted.

---

*Retired Justice of the Supreme Court sitting pro tempore under assignment by the Chairman of the Judicial Council.