140 So.2d 252 (1962)
James E. VINET, Individually and for the Use and Benefit of His Minor Child, Elizabeth Ann Vinet,
v.
CHECKER CAB COMPANY, Clarence J. Loup, New Orleans Public Service, Inc., and Alvin Monson.
No. 329.
Court of Appeal of Louisiana, Fourth Circuit.
April 2, 1962.
Rehearing Denied May 7, 1962.
Certiorari Denied June 20, 1962.
Anna Andollina, for plaintiff and appellant.
M. C. Scharff and A. J. Marciante, for Checker Cab Company and Clarence J. Loup, defendants and appellants.
*253 A. R. Christovich and W. W. Ogden, for New Orleans Public Services, Inc., and Alvin Monson, defendants and appellees.
Before McBRIDE, SAMUEL and HALL, JJ.
McBRIDE, Judge.
James E. Vinet instituted this action in tort for his individual account and also on behalf of his minor child, Elizabeth Ann Vinet, against Checker Cab Company and Clarence J. Loup, seeking to recover for medical expenses he expended together with damages for his mental anguish, and for the child's account he seeks damages for personal injuries sustained by her as a result of her having been involved and injured in an accident with a Checker Cab on March 6, 1959, at approximately 8:45 o'clock a. m., on St. Claude Avenue at the intersection of Alvar Street. The New Orleans Public Service, Inc., and Alvin Monson, operator of the bus from which the child had alighted just prior to the accident, are also impleaded as defendants.
After a trial of the case on the merits, there was judgment in favor of plaintiff in his individual capacity for the sum of $1,145.85, representing medical expenditures, and in his favor for the child's account in the sum of $2,500, to compensate for her personal injuries. The judgment runs against the Checker Cab Company and the operator of its cab, Clarence J. Loup. The suit as against New Orleans Public Service, Inc., and its employee, Alvin Monson, was dismissed. Checker Cab Company and Loup appealed; so did plaintiff. Plaintiff also answered the appeal of Checker Cab Company and Loup praying for an increase in the amounts of the judgment.
At the time above stated, Elizabeth Ann Vinet, who was then 6½ years of age, and her sister, Madeline, then aged 13, had alighted from the public service bus at said corner. This intersection is embraced in a "school zone" and the children were bound for the Washington School; to get to which destination it was first necessary that they cross the roadway of St. Claude Avenue which accommodates traffic traveling downtown. There is conflict in the testimony as to whether the two children started to make the crossing together, but after analyzing the evidence, we believe it to be a fact that Elizabeth Ann broke away from her older sister and started to run across the roadway in the pedestrian lane from the sidewalk curb to the neutral ground.
The intersection in question is controlled by an official semaphore light signal composed of the conventional red and green lights. At the time Elizabeth Ann started her dash, the green light was in her favor, that is, persons or vehicles traversing the intersection in the direction as was Elizabeth Ann had the right to proceed. The red light, of course, was then showing to traffic bound downtown on St. Claude Avenue. Pursuant to such restraining signal, the bus from which the children had alighted remained in its position with its front end adjacent to the pedestrian lane. Next to the bus (or in the middle lane of the roadway) was a "black car" (the driver of which was never identified), which had stopped at the pedestrian lane pursuant to the unfavorable light signal. Next to the "black car" was the Checker Cab which was also stopped awaiting a favorable signal. The cab was in the innermost lane, or, in other words, was adjacent to the neutral ground. Elizabeth Ann, therefore, to negotiate the roadway had to make her crossing in front of said three vehicles.
At this point it may be stated that the New Orleans Public Service, Inc., and its employee, Monson, who was in charge of the bus, were made defendants on an allegation based on information and belief that Monson observed the children in front of his bus and gave them a signal to cross St. Claude Avenue. This is alleged to have constituted negligence proximating the accident. There is no evidence whatsoever that the bus driver (since deceased) gave any sign which could be construed as a signal *254 to the children to make the crossing, and, therefore, said two defendants must be eliminated from all further consideration.
The light facing the three stopped vehicles changed to green whilst Elizabeth Ann was somewhere in the roadway. The public service bus did not move. However, the black car in the middle lane immediately started forward on the light change and then was as suddenly brought to a stop, this because Elizabeth Ann appeared in front of it and the stop was made by its driver to avoid hitting the child. Simultaneously with the black car starting forward, the Checker Cab moved ahead and there was contact between the child and the cab. Some evidence shows that the front of the cab hit Elizabeth Ann, but the cab driver emphatically stated the little girl ran into the side of the right front fender of his vehicle and fell to the ground. We will accept this statement as the truth as the cab driver's version would be the most favorable to defendants.
After the driver heard the thud, he came to a stop within four feet. He professes he did not know the child was in the pedestrian lane. He claims that before starting he looked first to his left (or toward the neutral ground) and saw no persons in the roadway. Then he looked to his right (the direction from which the child was coming) and:
"A. Well, I couldn't see much from my right on account of the cars on my right-hand side were parked there.
"Q. But you did look to your right?
"A. I did as much as I could.
"Q. Did the automobile that was next to you do anything at all after the light turned green?
"A. Well, he started and he stopped."
We feel that the taxicab driver's own testimony convicts him of the grossest kind of negligence. From his testimony it appears clear that he started forward immediately with the black car without making an effective effort to discover what persons or objects might be lawfully on the roadway. When he could not see toward his right, his duty was to wait a sufficient time before starting forward so that any person in the roadway would have the opportunity to attain a place of safety. Had he remained at a standstill a second or so longer, the little girl could have negotiated her crossing with complete safety.
Ordinance No. 828, M.C.S., as amended, provides in part in Div. IV, Sec. 38-42:
"(a) Green alone or `Go.'
"(1) Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits, either such turn. But vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited."
Thus, the ordinance controlling traffic in New Orleans makes it the plain duty of a motorist to look and permit any pedestrian in the intersection to clear the crossing before the motorist is privileged to proceed. These provisions are parallel to the jurisprudence of this state and of other jurisdictions.
Our Supreme Court in the case of Belshe v. Gant, 235 La. 17, 102 So.2d 477, 480, said:
"Thus, when the light suddenly turned from red to green in their favor, the present motorists were under a duty, before proceeding through the intersection, to exercise due care to discover any pedestrians already therein in reliance upon the previously red signal inhibiting motor traffic. * * *"
*255 The United States Court of Appeals, Fifth Circuit, in Texas Mut. Ins. Co. v. Curtin, 197 F.2d 617 (emanating from Louisiana) states:
"* * * One entering an intersection with a green light is entitled to pass across in safety, * * *. Kirk v. Los Angeles R. Corp., 26 Cal. 2d 833, 161 P.2d 673, 164 A.L.R. 1 and notes; Riddel v. Lyon, 124 Wash. 146, 213 P. 487, 37 A.L.R. 486, and notes; Railway Express Agency v. Little, 3 Cir., 50 F.2d 59, 75 A.L.R. 963, and notes. See also Schatz v. Kehoe, 15 La.App. 9, 131 So. 66, headnote 4.
* * * * * *
"* * * The pedestrian thus caught in mid-intersection by changing signals, may assume that cross traffic thus released against him will exercise due care, and that he will be accorded a reasonable time to reach a place of safety. Horwitz v. Eurove, 129 Ohio St. 8, 193 N.E. 644, 96 A.L.R. 782, and notes; Kirk v. Los Angeles R. Corp., supra; Quaker City Cab Co. v. Fixter, 3 Cir., 4 F.2d 327. * * *"
Our predecessor in Schatz v. Kehoe, 15 La.App. 9, 131 So. 66, 68, said:
"Of course, even though the green light gave to defendant the right to enter the intersection, it did not give him the right to cross without permitting pedestrians already on the roadway ahead of him time to complete their crossing. Crews v. Coogan, 7 La.App. 692; Harrison v. Loyocano, 12 La.App. 228, 125 So. 140. * * *"
In 164 A.L.R., page 61, note "e", it is said:
"It is clear that traffic stopped by a red light, officer's gesture, or semaphore stop signal must remain stationary until a favorable signal is given. It is, moreover, not infrequently held that the appearance of a favorable signal confers only a qualified permission to advance and that vehicle drivers who have stopped in obedience to an unfavorable signal must not proceed into the intersection upon the signal's change before permitting traffic lawfully therein to complete its crossing. * * *"
Under said note is cited Crews v. Coogan, 7 La.App. 691, in which appears the following language:
"It is admitted that plaintiff entered the intersection on the green light and was struck by defendant's car before he had completed the crossing. Defendant contends that his car with two others, all abreast of each other, his car being nearest the sidewalk curb, were at rest on the upper or south side of Canal Street, awaiting a green signal to cross the Broad street intersection from the direction of the lake towards the river, and that he started the car after the green signal appeared, the two other cars starting at the same time. * * *
"Whether defendant started prematurely, as seems likely, or awaited the green signal, as he claims, is immaterial. Plaintiff under the plain terms of the traffic ordinance was privileged to proceed until he had completed the crossing, and the traffic crossing his path, whether on the green light or not, was charged with knowledge of his possible presence in the intersection if he could not be seen."
In Capillon v. Lengsfield, La.App., 171 So. 194, 196, the court said:
"* * * It seems evident that the defendant started his automobile immediately after the signal light changed from red to green. * * * his view of traffic proceeding across St. Charles avenue from the lake side to the river side was screened by the automobiles and street car which were adjacent to him on his left. * * * Even though the defendant was entitled to cross the intersection when the *256 signal light changed to green, he did not have a right to proceed ahead of traffic already rightly in the intersection and he was not justified in assuming that the intersection was clear. * * *"
In 164 A.L.R., pgs. 61 and 62, this language appears:
"The change of the light from red to amber does not justify traffic in moving across the intersection until reasonable opportunity has been given for pedestrians properly upon the street to reach the sidewalk, or some place of safety, and due care must be exercised by a motorist or street car operator with regard to pedestrians who may be caught with the traffic change even after the signal has changed to green in favor of the motorist. He may not proceed across, heedless of pedestrians who may be in the intersection, even though the green light is in his favor. * * *"
In Duke v. Gaines, 224 Ala. 519, 140 So. 600, 602, the Court said:
"The line of pedestrians may continue to enter the intersection as long as confronted by the green light. Those entering just before the amber light appears cannot, at usual speed, pass the center of First avenue before the green light appears facing eastbound automobiles. To say the green light is an invitation to heedlessly proceed would render the traffic signals a trap for pedestrians under such conditions."
In Mosher v. Parker, 3 West Week Rep. 570 (Supreme Court, British Columbia), the Court said it was the duty of a motorist "to make sure there was no pedestrian on the crossing with whom his car might collide, before he proceeded * * *."
In 164 A.L.R., at p. 27, it is stated:
"* * * In other words, while one approaching an intersection with the green light in his favor has the right of way and it may perhaps be inferred or presumed that he will exercise that right of way fairly and properly, the favorable green light is not to be taken to mean that a motorist may go through an intersection without regard to the circumstances. * * *"
Whether the taxicab struck the child or vice versa, the accident arose from the fault of the driver. The child's injuries were of a serious and painful nature. She was conveyed to a hospital where it was ascertained she had sustained a fracture of a thigh bone which required traction for over a month, after which she was placed in a one and a half spica (bandage) for more than two months. Dr. W. H. Newman, orthopedist, treated her from the date of the accident until July 9, 1959, or for more than three months. Her total stay in the hospital was thirty-two days. The injuries were painful and it was necessary to administer opiates to relieve the child's suffering. Fortunately, she suffered no permanent injuries. The trial judge allowed her $2,500 which we think does substantial justice, and we see no reason why the award should be disturbed either way.
Plaintiff was allowed $1,145.85 individually, which sum represents the exact amount of expenses incurred in connection with the injuries. In his answer to the appeal he prays that the award be substantially increased, and in brief counsel points out that plaintiff suffered extreme mental anguish as a result of his little daughter's injured condition. The contention is that such would constitute an item of damage.
It is well established in this state that one person cannot recover damages for worry and mental suffering as a result of injuries to the person of another; the right to damages is personal to that other. Vol. 4, Dart's New La.Dig., "Damages," § 41.
Counsel also points out that while plaintiff's wife was absent from the home *257 visiting the hospitalized child, this imposed upon him the additional burden of caring for their other children during the wife's absence. This could hardly be considered an item of damages. Plaintiff was performing nothing more than natural and expected duties the parent owes his children.
Therefore, for the reasons above assigned, the judgment appealed from is affirmed.
Affirmed.