335 So.2d 725 (1976)
Theda Kay PARKER and Narvel Parker, Plaintiffs-Appellants-Appellees,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY et al., Defendants-Appellants-Appellees.
No. 12947.
Court of Appeal of Louisiana, Second Circuit.
July 7, 1976.
Rehearing Denied August 3, 1976.[*] Writ Refused October 27, 1976.
*727 Shaw & Shaw by W. M. Shaw, Homer, for plaintiffs-appellants appellees, Theda Kay Parker and Narvel Parker.
Lunn, Irion, Switzer, Johnson & Salley by Richard H. Switzer, Shreveport, C. Sherburne Sentell, Jr., Minden, for defendants-appellants appellees, Minden Sanitarium, Inc. and Firemen's Ins. Co., of Newark, N.J.
Campbell, Campbell & Johnson by James M. Johnson, Minden, for defendants-appellees, Dr. James Robert Kemmerly, Dr. Charles D. Hancock, Jr. and St. Paul Fire & Marine Ins. Co.
Adams & Reese by Richard C. Baldwin, New Orleans, for Dr. James Robert Kemmerly and Dr. Charles D. Hancock, Jr.
Before PRICE, HALL and JONES, JJ.
En Banc. Rehearing Denied August 3, 1976.[*] Writ Refused October 27, 1976.
HALL, Judge.
This is a suit for damages by a husband and wife based upon alleged malpractice by their obstetrician and the employees of a hospital in connection with the delivery of their third child by induction of labor and in connection with treatment of the wife for complications following the birth of the child.
The suit was filed in December, 1972, by Mrs. Theda Kay Parker and her husband Narvel Parker, who lived in Minden, Louisiana. Named as defendants were (1) Dr. James Robert Kemmerly, a Minden obstetrics and gynecology specialist who delivered the child and treated Mrs. Parker; (2) Dr. Charles Hancock, Jr., a Minden physician who assisted Dr. Kemmerly in surgery performed on Mrs. Parker following delivery of the child; (3) St. Paul Fire & Marine Insurance Company, the liability insurer of the two physicians; (4) The Minden Sanitarium, Inc., owner of the hospital where the delivery and treatment took place; (5) Benny Salter, a laboratory technician employed by the hospital; and (6) Firemen's Insurance Company of Newark, New Jersey, the liability insurer of the hospital and Salter.
The case was tried in March, 1975, before a jury which awarded $20,000 to Mrs. Parker and $30,000 to Mr. Parker against the hospital and its insurer and rejected plaintiffs' claims against all other defendants. Plaintiffs, the hospital and the hospital's insurer appealed.
On appeal, plaintiffs acknowledge they have no claim against Dr. Hancock as no fault on his part was proved and further acknowledge they have no claim against Salter who discharged the claim in bankruptcy proceedings. Plaintiffs seek an increase in the awards and seek to have Dr. Kemmerly and his insurer held in solido with the hospital and its insurer. The hospital and its insurer urge that Mr. Parker is not entitled to any award and that the award in favor of Mrs. Parker is excessive.
The Facts
Upon learning of the pregnancy of Mrs. Parker, plaintiffs consulted with and employed Dr. Kemmerly to provide prenatal care and delivery of the baby. Dr. Kemmerly and Mrs. Parker calculated that the *728 estimated time of arrival of the baby in the natural course of events would be January 24-26, 1972.
The Parkers already had two children ages six and two. Plaintiff was in labor six hours after her "water broke" when she gave birth to her first child. She was in labor three hours when she gave birth to her second child which was delivered by Dr. Kemmerly. In connection with the delivery of her second child, Dr. Kemmerly performed an amniotomy for the purpose of inducing labor. The term amniotomy simply means an artificial breaking by the doctor, using some type of instrument, of the membranes or "bag of waters". Following the breaking of membranes, the water leaves the uterus and a hormone "oxytocin" commences to secrete and labor follows naturally. Labor was induced in connection with the delivery of the second child primarily for the convenience of Mrs. Parker and her husband who were living in Texas at the time. There were no complications whatsoever.
During Mrs. Parker's third pregnancy she visited Dr. Kemmerly regularly and there were no unusual complications. Dr. Kemmerly and Mrs. Parker discussed inducing labor and it was agreed that the delivery would be done in the same manner as with the second child. Examination by Dr. Kemmerly revealed that some dilation of the cervix had occurred in December and on January 6, 1972 there was further dilation. On this date Dr. Kemmerly and Mrs. Parker selected January 14 as the date for inducing labor to bring about the birth of the baby. On January 14, Mrs. Parker checked into the sanitarium about mid-day and the amniotomy was performed in the early part of the afternoon. Approximately two and one-half hours later, at approximately 5:00 p.m., Mrs. Parker gave birth to a healthy six pound baby boy, the delivery up to that point being without any complications.
After delivery of the child and the delivery or expelling of the after-birth, Dr. Kemmerly observed an excessive amount of bleeding from the vagina, apparently due to a failure of the uterus to contract. In the usual or normal situation, following the expulsion of the placenta, the uterus contracts closing blood vessels or sinuses in the muscular wall of the uterus and stopping the flow of blood. When the uterus fails to contract (uterine atony), the result is postpartum hemorrhage or excessive bleeding.
Dr. Kemmerly performed some exterior massage of the uterus, which is a normal procedure in connection with deliveries to encourage the uterus to contract. This massage is performed by placing the hand on the mother's abdomen and maneuvering it in such a fashion as to massage the uterus. When the bleeding continued Dr. Kemmerly carefully examined Mrs. Parker to be certain there were no tears or lacerations in the uterus itself or any injury at the entry to the vagina where stitches were placed following birth. The doctor found none of these situations to exist and commenced the administration of a synthetic oxytocin hormone known as pitocin. In a further effort to cause the uterus to contract, Dr. Kemmerly performed bimanual compression of the uterus by placing one hand on the uterus through the vagina and massaging it against the other hand on the abdomen. The use of the drug and various massaging methods were ineffective and Mrs. Parker continued to hemorrhage.
Dr. Kemmerly then made the decision, in order to prevent Mrs. Parker from bleeding to death, to perform an emergency hysterectomy and remove the uterus. This decision was made about 6:00 p.m. in the afternoon. Dr. Kemmerly called for the appropriate staff and made the necessary arrangements for performing the operation. He advised Mr. Parker of the situation and Mr. Parker told the doctor to do what was needed. Mrs. Parker was removed from the delivery room into the operating room. A blood transfusion was commenced while Mrs. Parker was still in the delivery room *729 and continued after she was moved to the operating room. There were two 500 cc. units of blood available at the time of the commencement of the initial transfusion. Mrs. Parker had O-positive blood and both of the available units were properly matched to be used for her transfusion.
Present in the operating room were Dr. Kemmerly, Dr. Hancock, who happened to be in the hospital and volunteered to assist, Mrs. T. L. Slay, an anesthetist, Mrs. Edna Gantt, surgical nurse, and Mrs. Estelle Amason, circulating nurse. The three ladies were all employees of the hospital. Also present was a Mrs. Shaw, a nurse at the hospital who was a friend of Mrs. Parker, but who performed no duties in connection with the operation.
Shortly before the operation was commenced Dr. Kemmerly ordered an additional two units of blood to be obtained from the hospital blood laboratory which was under the control of Benny Salter, a laboratory technician employed by the hospital.
The operation was commenced. While it was in progress, Mrs. Edna Shirley, a nurses' aide employed by the hospital whose duties were primarily related to the care of babies in the nursery, went to the hospital laboratory for the purpose of giving blood for Mrs. Parker. Mrs. Shirley was handed two 500 cc. units of blood along with lab slips by Salter. She understood Salter to instruct her to carry them to the operating room. Salter testified he instructed her to carry them to the second floor where they were to be given to another patient, a Mrs. Spruell. In any event, Mrs. Shirley carried the blood to a room adjoining the operating room where she was met by Mrs. Amason, the circulating nurse. Mrs. Amason and Mrs. Shirley checked the numbers of the blood containers against the numbers on the lab slips, found them to correspond, and concluded it was the correct blood for Mrs. Parker. They failed to observe that Mrs. Spruell's name and room number were on the slips and that Mrs. Parker's name and room number were not. The blood brought by Mrs. Shirley to the operating room was A-positive which is incompatible with Mrs. Parker's O-positive blood.
The three people in the operating room who functioned immediately in the operating field were Dr. Kemmerly, Dr. Hancock and the surgical nurse, Mrs. Gantt. All three of these persons were scrubbed or carefully washed and germ free. The circulating nurse, Mrs. Amason, functioned outside of the operating field and was not scrubbed. Mrs. Slay, the anesthetist, functioned at the patient's head outside of the operating field and was not scrubbed. The evidence is that it would be improper for anyone scrubbed to participate in any way with the checking of the blood or the commencement of the transfusion. Dr. Kemmerly was operating deep in the patient's pelvis at the time the blood was delivered to the operating room.
Either Mrs. Amason or Mrs. Slay placed the units of blood brought by Mrs. Shirley on the I.V. pole and commenced the transfusion of the blood into Mrs. Parker. Mrs. Parker received one full 500 cc. unit of the A-positive blood and approximately 100 cc.'s of the second unit before the error that Mrs. Parker was being infused with incompatible blood was discovered.
The laboratory technician, Salter, received an inquiry about the blood from Mrs. Spruell's room and immediately realized there was a probability the blood intended for her had gone to the operating room. Salter rushed to the operating room and advised Dr. Kemmerly that Mrs. Parker was being given the wrong type blood. The transfusion was immediately stopped and Salter took the remaining portion of the unit of A-positive blood to Mrs. Spruell's room and it was apparently thereafter administered to her.
Dr. Kemmerly immediately ordered more of the proper O-positive blood for Mrs. Parker and it was obtained and the transfusion *730 resumed. The doctor also immediately began to give Mrs. Parker other necessary liquids for the purpose of diluting the incompatible blood in Mrs. Parker's system and making available sufficient liquid in order that the incompatible blood would be excreted from her body through her kidneys and bladder in her urine. He was assisted in this by Dr. Gary Daniels, who came to the operating room while surgery was in progress and who made "cutdowns" in Mrs. Parker's ankles where infusion tubes were inserted.
The principal treatment of a person who has received incompatible blood is the giving of large volumes of correctly matched blood and other medical liquids in order that ample liquids are in the body to provide a place for the incompatible blood to be broken down by bodily processes and eventually leave the body through the kidneys and bladder. One of the greatest dangers from receiving incompatible blood is damage to the kidneys.
Thereafter the hysterectomy proceeded and was completed without any further complications. During the operation Mrs. Parker maintained an adequate urine flow which was assisted and measured by a prior Foley catheter which was inserted prior to surgery.
After surgery, Dr. Kemmerly had the first of several telephone consultations with Dr. Michael Ellis, pathologist at Bossier General Hospital and consultant pathologist for The Minden Sanitarium. Dr. Ellis agreed and approved the treatment administered by Dr. Kemmerly in connection with the transfusion reaction.
Mrs. Parker required several more blood transfusions that night. She did not go into shock. She was treated with large amounts of intravenous fluids to keep her urine flow in excess of a certain level. During surgery and during the postoperative period, Mrs. Parker received a total of twelve or thirteen units of blood. Tests were made postoperatively which indicated no kidney damage.
On Monday night following the delivery and surgery on Friday, Dr. Kemmerly told Mr. Parker for the first time about the transfusion episode.
On January 20, Dr. Kemmerly had a telephone consultation with Dr. James Johnson, assistant professor of medicine and chief of the section of nephrology at LSU School of Medicine in Shreveport. Dr. Johnson examined the patient on January 22, reviewed the tests previously made, and made an additional test which revealed no evidence of renal or kidney damage and no anticipated future renal problems.
Mrs. Parker's postoperative course was complicated by an episode of pulmonary edema and bronchopneumonia which responded rapidly to treatment. She ran a fever which responded slowly but progressively to antibiotic therapy. Mrs. Parker and her child were discharged from the hospital on January 27, thirteen days after delivery and surgery.
After Mrs. Parker went home she ran some fever and had some pain and discomfort and needed help with the housework for a brief period of time. She soon resumed normal activities and thereafter had no significant medical problems related to her hospitalization except possibly cystitis. In March, 1972, about two months after her hospitalization, Mrs. Parker was examined by Dr. Kemmerly, complaining of blood in the urine and back pain. Her condition was diagnosed as cystitis. In July, 1973, more than a year later she was examined by Dr. John Berry, a Shreveport urologist. At this time she was complaining of blood in the urine and frequency of urination. Dr. Berry diagnosed her condition as hemorrhagic cystitis.
In November, 1973, Mrs. Parker was treated for mononucleosis by Dr. John W. Wilson, Jr. and was hospitalized in Bossier General Hospital. During this hospitalization *731 Mrs. Parker was given further tests to determine if she was having any problems with her kidneys and the tests indicated no kidney problems.
In February and March, 1975, shortly before trial, Mrs. Parker was examined by Dr. H. M. Yearwood, a Shreveport urologist. Dr. Yearwood diagnosed her problem at that time as a low-grade chronic cystitis.
During the summer of 1972, Mrs. Parker had several teeth pulled.
Following Mrs. Parker's recuperation from her surgery in the spring of 1972, she became very religious, participating in many church activities and engaging in religious discussions. Prior to the surgery, the Parkers attended church regularly on Sunday but their interest in church activities intensified after her hospitalization. Mr. Parker became superintendent of the church school. Mrs. Parker described this period, which lasted about a year, as a happy period in their married life.
In about the summer of 1973, more than a year after the surgery, Mrs. Parker became disenchanted with her church activity and also with her husband. She began to go places with younger female friends and, unknown to Mr. Parker, began to frequent nightclubs on "The Strip" in Bossier City while he was away from home. Eventually, Mrs. Parker insisted on a separation from him which subsequently resulted in a judicial separation, following which there was a reconciliation for a short period of time, and thereafter a divorce. At the time of trial Mrs. Parker was married to a Mr. Lee.
Between the time of her separation from Mr. Parker and her second marriage, Mrs. Parker lived in several apartment complexes in the Shreveport-Bossier area with her three children. She worked at several different office jobs. She dated numerous men, some married and some single, had an active night life and issued numerous worthless checks. She was eventually charged with and pled guilty to the crime of issuing worthless checks. In the summer of 1974, Mrs. Parker was examined by Dr. James Phillips, a Shreveport psychiatrist, who found she suffered from depression in her then situation relating back to long-standing conflicts with her mother and to her unhappy marriage. Mrs. Parker attended several group therapy sessions. The hospital incident was not mentioned by Mrs. Parker to Dr. Phillips and was mentioned only once casually at a group therapy session.
When the Parkers' marriage broke up, Mr. Parker found himself in financial difficulty because of his wife's inattention to paying bills and later because of his efforts to cover her bad checks and otherwise help her financially. Mr. Parker moved, changed jobs, and eventually Mrs. Parker voluntarily gave custody of the three children to him. At the time of trial, Mr. Parker was working for the Webster Parish School system, had not remarried, and had the three children with him.
Alleged Negligence of Dr. Kemmerly
Plaintiffs contend Dr. Kemmerly was negligent (1) in employing elective inducement of labor, that is, inducing labor for convenience rather than for medical reasons; (2) in failing to advise plaintiffs of the dangers of elective induction of labor and hence failing to obtain plaintiffs' informed consent to this procedure; (3) in failing to administer the most important conservative treatment for postpartum hemorrhage; (4) in failing to check the blood which was given to Mrs. Parker by mistake; (5) in giving Mrs. Parker the wrong medication and failing to give her the right medication after discovering that she had been given incompatible blood; and (6) in failing to timely consult a proper medical specialist about treatment of the blood transfusion reaction.
Dr. Kemmerly's actions and his liability or nonliability in this case are to be measured by the standards enumerated in the landmark case of Meyer v. St. Paul-Mercury *732 Indemnity Co., 225 La. 618, 73 So.2d 781 (1953):
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."
Plaintiffs' case rests primarily on the testimony of Dr. Harvey L. Jorgenson, a 66 year old physician from Miami, Florida. Dr. Jorgenson is a general practitioner and surgeon with no special education or training in obstetrics, gynecology or internal medicine. He did general practice for about twenty years in Wisconsin and in 1951 moved to Miami where he has practiced since that time. He delivered many babies while in general practice in Wisconsin but has only delivered one baby since 1951. He was obtained as a witness through a Miami based operation known as Expertise Institute. Cases are sent to Dr. Jorgenson by the Institute for his review and advice. He had prepared between fifty and one hundred reports for the Institute and had testified in between ten and twenty cases involving medical problems. Dr. Jorgenson never examined Mrs. Parker. His testimony was based on an examination of the records relating to her case and, of course, on his knowledge and experience.
Dr. Jorgenson was of the opinion that induction of labor should not be practiced in the absence of medical or surgical reasons therefor. His principal objection to the use of induction of labor in Mrs. Parker's case was that he found no reason in the record to explain why the induction was carried out. Dr. Jorgenson testified there was a controversy in the medical profession over elective induction of labor, that is, induction of labor for convenience without medical or surgical reasons therefor. Dr. Jorgenson testified that postpartum hemorrhage is one of the possible complications of elective induction of labor. He did not express an opinion that the postpartum hemorrhage in Mrs. Parker's case was actually caused by the induction of labor.
Dr. Kemmerly, a well-educated and trained board-certified specialist in obstetrics and gynecology with many years experience, explained in his testimony that his decision to induce labor was based upon medical reasons. Mrs. Parker's first child was delivered six hours after labor commenced and her second child three hours after labor commenced. The indication from these previous experiences was that the third pregnancy would be terminated by an even shorter period of labor. The risk involved in delivering a baby at home before the patient could reach a hospital are obvious. Likewise, the advantages of having the mother in the hospital when labor commences are obvious. Dr. Kemmerly also took into account the fact that he was told Mr. Parker became extremely excitable when Mrs. Parker's water broke at home during her first pregnancy. He also took into account the previous delivery by induction of labor which was successful and without complications. Dr. Kemmerly's explanation of the medical reasons for inducement of labor totally satisfy Dr. Jorgenson's inquiry as to the reason for inducing labor in this particular case. The procedure was employed for sound and logical medical reasons.
Dr. Kemmerly considered there was no increased or added risk to a mother when labor is induced by amniotomy at a time when she is at term and factors indicate a readiness to deliver. A patient is considered ripe or ready to deliver if (1) the patient is within a period of less than two weeks of the estimated arrival date; (2) it is determined by measurement that the *733 baby is large enough; (3) there is dilation of the cervix; (4) the baby's head is well down in the pelvis; and (5) the water bag or membrane bag is pushed down in the mouth of the cervix. All of these factors were in existence at the time Mrs. Parker was hospitalized and labor induced.
Testifying in support of Dr. Kemmerly were Dr. Milton S. Richardson, Dr. Gary Lynn Daniels, Dr. John Hill and Dr. Mc-Intyre Bridges, all physicians practicing in Minden, Louisiana, and all with extensive experience in the delivery of babies. Also testifying on behalf of Dr. Kemmerly were Dr. Gary Brooks, assistant professor in obstetrics-gynecology at LSU Medical School in Shreveport and Dr. Oscar Lee Berry, Jr., a Shreveport specialist in obstetrics and gynecology. All concurred with Dr. Kemmerly concerning the advisability of inducing labor in Mrs. Parker's situation. All concurred in Dr. Kemmerly's opinion there is no increased danger to the patient as a result of induction of labor by amniotomy where the "ripeness" factors are present as was the situation with Mrs. Parker. All testified they reviewed the hospital records and Dr. Kemmerly's records in connection with the delivery of Mrs. Parker's baby and found his work exemplary and that he was guilty of no wrongdoing whatsoever in his inducement of labor and the delivery of her third child. Although some of the medical witnesses practiced inducement of labor more than others, the clear thrust of their collective testimony was that inducement of labor by amniotomy under the circumstances existing in this case is a common, widely-practiced procedure in this locality and, indeed, nationwide.
The testimony of the witnesses was further to the effect that there was no relationship between the induction of labor and the postpartum hemorrhage which occurred in this instance.
The evidence shows that the cause of postpartum hemorrhage resulting from uterine atony is unknown, although it may most often be related to overstimulation of the uterus. The record in this case, including the testimony of Dr. Jorgenson, contains no support for a finding that the postpartum hemorrhage was caused by or related to the inducement of labor by amniotomy.
Plaintiffs assert that Dr. Kemmerly is guilty of malpractice for the additional reason that while they consented to the induction of labor their consent was not an informed consent because they were not advised and were unaware of the danger of a postpartum hemorrhage as an added risk.
Louisiana law recognizes the informed consent doctrine. Not only must a patient consent to an operation but such consent must be an informed consent. A physician has a duty to disclose material facts reasonably necessary to allow the patient to form the basis of an intelligent consent. Goodwin v. Aetna Casualty & Surety Company, 294 So.2d 618 (La.App. 4th Cir. 1974). It is not incumbent upon an attending physician to advise a patient as to every conceivable possibility and eventuality that may stem from that physician's treatment. If the possibility is one that can reasonably be anticipated and falls within the expertise of the treating physician, then the treating physician should so inform his patient. Delaune v. Davis, 316 So.2d 7 (La.App. 1st Cir. 1975). Consent is not properly given if the operation involves risks and results not contemplated or explained to the patient. Rogers v. Lumbermens Mutual Casualty Company, 119 So.2d 649 (La.App. 2d Cir. 1960). A physician's failure to disclose a possible danger is not a breach of duty on his part in the absence of a showing that the patient's consent would have been withheld if the patient had been informed of the danger. Goodwin v. Aetna Casualty & Surety Company, supra; Zachary v. St. Paul Fire & Marine Ins. Co., 249 So.2d 273 (La.App. 1st Cir. 1971).
*734 There was no breach of duty on the part of Dr. Kemmerly in failing to advise plaintiffs of the risk of postpartum hemorrhage because there was no added or additional risk of postpartum hemorrhage created by the performance of an amniotomy. Postpartum hemorrhage is a risk or possibility in the delivery of a baby under any circumstances. Inducing labor by amniotomy under the circumstances present in this case created no additional risk and there was no duty on the part of Dr. Kemmerly to discuss the possibility with his patient. Further, as previously noted, there is no evidence linking the postpartum hemorrhage to the amniotomy.
Plaintiffs' next charge is that Dr. Kemmerly did not administer the most important conservative treatment to stop the postpartum hemorrhage, that is, bimanual compression of the uterus. All of the medical evidence is to the effect that among the conservative treatment procedures which should be given a patient who is suffering from postpartum hemorrhage are bimanual compression of the uterus, administration of a synthetic oxytocin drug and careful examination of the uterus for tears and lacerations. Dr. Kemmerly's testimony and the record of the treatment given Mrs. Parker establish that he performed all of these conservative methods in an attempt to stop the excessive bleeding. Plaintiffs' contention that the medical records were falsified and altered at a later date to include mention of the bimanual compression is not at all persuasive. In spite of the proper conservative procedures skillfully employed by Dr. Kemmerly, the hemorrhage continued and he had no alternative but to perform an emergency hysterectomy to save the patient's life. The several doctors testifying on behalf of Dr. Kemmerly all agreed that he took the proper conservative measures and that he made the correct decision when he proceeded to perform the hysterectomy in order to stop the hemorrhage.
Plaintiffs next contend that Dr. Kemmerly was negligent in failing to check the blood brought into the operating room before it was transfused into Mrs. Parker and that he is responsible for the negligence of the nurses under the "Captain of the Ship" doctrine.
At the time the blood was brought into the operating room, Dr. Kemmerly was operating deep within the pelvis of the patient. The medical evidence is positive that it would have been entirely improper for him to divert his attention from the operation to check the units of blood to determine if it was the correct type. Such action on his part would have interfered with the progress of the operation and would have required him to go outside of the sterile operating field. It was entirely proper for him to continue with the operation and for him to rely upon the employees of the sanitarium, the nurses, to check and be certain that the blood was of the proper type for Mrs. Parker. There was no negligence on the part of Dr. Kemmerly in failing to check the units of blood and he is not responsible for the error of the hospital employees, unless as contended by plaintiffs, he is responsible under the "Captain of the Ship" theory.
In Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969), the Supreme Court held that while it is the general rule that the surgeon is in charge of all personnel during the performance of the operation, the borrowed servant doctrine does not apply in the instance of operations performed under modern techniques requiring team performance where the nurses and other personnel assisting in the operating room are not at all times under the immediate supervision and control of the operating surgeon. This holding is applicable to the instant case. While Dr. Kemmerly had the right to direct the nurses in attendance in the operating room, the nurses in checking the units of blood and in commencing the transfusion were not *735 responding to the operating surgeon's exclusive control and were not under his immediate supervision and control in conducting that particular procedure. Dr. Kemmerly is not responsible for the negligence of the hospital personnel in this case.
Plaintiffs' next allegation of malpractice is that Dr. Kemmerly, after discovering Mrs. Parker had been administered incompatible blood, compounded the error by giving her the wrong medication and failing to give the right medication.
The treatment provided by Dr. Kemmerly following the discovery of the fact that Mrs. Parker received approximately 600 cc.'s of incompatible blood was generally the immediate transfusion of correct O-positive blood into Mrs. Parker along with large volumes of liquids to assist Mrs. Parker's body in the expulsion of the incompatible blood through her kidneys and urinary tract. Dr. Kemmerly further administered drugs for the treatment of this problem including cortisone, alkaline, loridine and garamycin. In connection with the infusions, Dr. Kemmerly had Dr. Daniels make the necessary cuts on Mrs. Parker's ankles to facilitate the introduction of the liquids. A Foley catheter was used, apparently for the dual purpose of assisting Mrs. Parker in disposing of urine following her hysterectomy and for the purpose of maintaining an adequate measurement of the urine output which must be maintained at a high level in order to speedily dispose of the incompatible blood in order to avoid damage to the kidneys and other organs of the body.
Dr. Jorgenson disagreed with this method of treatment on the theory that so much fluid superhydrates the patient and puts water in the lungs and places an increased load on the heart. He recommended the use of diuretic mannitol and lasix to increase kidney function in lieu of the use of so much liquid.
The physicians who testified on behalf of Dr. Kemmerly all agreed with the treatment performed by him for the incompatible blood problem and agreed that the use of mannitol and lasix was not called for or necessary in this case because Mrs. Parker maintained a sufficient urinary output.
The fact that Mrs. Parker received no damage to the kidneys or other vital organs as a result of having received the mismatched blood is in itself proof that she received proper treatment for the problem. The testimony of plaintiffs' general medical witness who is not an expert in the field of transfusion reactions is in opposition to the testimony of the several well-qualified physicians testifying on behalf of defendant and under such circumstances, the opinion of plaintiffs' witness cannot be accepted.
Plaintiffs contend that Dr. Kemmerly was negligent in failing to consult an internal medicine specialist until several days after the occurrence.
Drs. Hancock and Daniels were present and assisting during the crisis. Dr. Kemmerly consulted by telephone with the sanitarium's pathologist on the evening of the incident. He consulted with Dr. Johnson several days later. The doctors with whom he consulted concurred in Dr. Kemmerly's treatment of the blood condition. Other physicians who reviewed the record at later dates agreed that Dr. Kemmerly's treatment of the problem was entirely adequate and proper. The problem was within the sphere of Dr. Kemmerly's own training and expertise. It is not shown that consultation with an internal medicine specialist would have resulted in any different or additional treatment or that any such treatment would have been more beneficial than what was done.
The treatment administered by Dr. Kemmerly was within the area of his expertise and was proper. He obtained adequate consultation with other physicians under the circumstances. There was no need for further and additional consultations with other specialists. Dr. Kemmerly was not *736 guilty of negligence or malpractice in this respect.
This court concludes, as did the jury, that Dr. Kemmerly was not at fault in any respect and is not liable to plaintiffs. In his treatment of Mrs. Parker, the doctor exercised the degree of skill ordinarily employed under similar circumstances by the members of his profession in good standing in the same community or locality, and used reasonable care and diligence, along with his best judgment, in the application of his skill to the case. In fact, Dr. Kemmerly's treatment, judgment and skill, when confronted with life-endangering emergencies to which he had in no way contributed, was exemplary and resulted in saving the patient's life with little or no serious medical aftereffects.
The Award of Damages to Mrs. Parker
Mrs. Parker is entitled to an adequate award against the hospital and its insurer for the damages she sustained as a result of the negligence of the hospital's employees in giving her the incompatible blood. The jury awarded Mrs. Parker $20,000.
Plaintiff argues that the award is inadequate. Plaintiff contends that the transfusion error and the treatment therefor caused her serious and permanent physical injuries. She points to the transfusion reaction itself, her critical condition in the hospital, the development of pneumonia and continued fever and aches and pains during the period of her hospitalization and recuperation. She further claims serious and permanent damage to her kidneys and that her generally poor health and various medical problems since the surgery were all caused from the transfusion problem. In addition to the physical injuries Mrs. Parker seeks damages for the psychological, emotional and social losses she claims to have suffered as a result of the hospital's negligence. Her claim is that the blood transfusion incident caused an emotional breakdown which resulted in a divorce between herself and her husband, the loss of all the property which they were acquiring prior to this incident, the complete loss of her normal lifestyle, the adoption of an antisocial lifestyle which ultimately resulted in her conviction for issuing worthless checks, and finally, a nervous collapse necessitating psychiatric treatment and group therapy.
On the other hand, the hospital and its insurer contend that the blood transfusion error caused Mrs. Parker no damage or loss other than the immediate consequences at the time of the incident and shortly thereafter during recuperation. Defendants argue that Mrs. Parker suffered no serious or permanent physical injury and that her subsequent medical and emotional problems are entirely unrelated to the incident in the hospital.
There is no evidence that Mrs. Parker suffered any damage to the kidneys or other organs of her body as a result of the transfusion reaction. The tests performed at the time and subsequently all indicate no damage to the kidneys. Although damage to the kidneys is one of the primary dangers of a transfusion reaction, the evidence in this case is that there was no such damage. Dr. Jorgenson suggested that a biopsy should be performed as a further test to determine whether there was kidney damage but all of the other doctors were of the opinion a biopsy was unnecessary and the tests already performed were entirely adequate. The fact that she had no kidney problems between the time of the incident and the time of trial is further proof that there was no kidney damage.
The evidence is that Mrs. Parker's other medical problems subsequent to the incident such as mononucleosis and loss of teeth are entirely unrelated to the receiving of incompatible blood, with the possible exception of her chronic cystitis.
There is no indication in the record that Mrs. Parker had ever been troubled with cystitis prior to the delivery of her third child. Generally, cystitis is defined as an *737 inflammation in the urinary system including the bladder and urethra. Cystitis is generally caused by a bacterial infection. Mrs. Parker's cystitis has no relationship whatsoever to the mismatched blood. It was established, however, that the use of a catheter can cause cystitis and it was recognized in the medical testimony that the use of the catheter in this instance could have some relationship with Mrs. Parker's chronic cystitis.
The record establishes it was necessary to use the catheter in connection with the treatment of Mrs. Parker for the blood transfusion reaction. The record also establishes, however, that the catheter was already in use in connection with the hysterectomy. The evidence indicates that the catheter was probably used for a longer period of time because of treatment of the blood transfusion reaction. The use of the catheter in connection with the treatment of the blood transfusion reaction could be a contributing cause of Mrs. Parker's cystitis and could reasonably be considered in the assessment of damages to be awarded.
In regard to the pneumonia Mrs. Parker developed while in the hospital following the hysterectomy and the fever she ran during that time, the evidence is that bronchopneumonia is a commonplace occurrence for patients who receive general anesthesia in connection with surgery. The same holds true for fever. It would be difficult to relate these matters directly to the blood transfusion reaction and treatment, but it seems reasonable to conclude that the blood problem and treatment contributed to her overall weakened and critical condition and pain and suffering while in the hospital and during her recuperative period.
The evidence does not in any way justify a finding of causal relationship between the blood transfusion incident and Mrs. Parker's subsequent emotional problems, divorce, and other activities. It is significant that for a period of approximately one year after the delivery of the child until her separation from her husband, the Parkers were extremely happy. Mrs. Parker testified they were happier than they had ever been during that time. The fact that Mrs. Parker's religious interests intensified during this period does not demonstrate a harmful emotional effect from the hospital incident. The hospital incident is entirely remote from the personality changes that seemed to manifest themselves some year and one-half later. Assuming that her conduct of leaving her husband, dating numerous men, writing hot checks, frequenting disreputable places and subsequently surrendering her children to her husband were due to personality disorders, there is no basis for connecting these disorders with the blood transfusion problem. Mrs. Parker's psychiatrist, Dr. Phillips, specifically expressed the opinion that there was no relationship between her hospitalization and her psychological problems, which he related to entirely different sources.
Mrs. Parker suffered a significant traumatic experience, physically and mentally, by reason of the blood transfusion error. The experience undoubtedly caused her significant physical and mental pain and suffering during her hospitalization and for a period of time thereafter, particularly until it was well established that she would have no aftereffects. Fortunately, primarily through the competence of her treating physician, Dr. Kemmerly, Mrs. Parker suffered no permanent damage or after-effects, other than possibly the cystitis which may be related to the surgery and the blood transfusion problem.
Mrs. Parker is entitled to a substantial award against the hospital but our conclusion is that the award of $20,000 by the jury under the circumstances is excessive and amounts to an abuse of the jury's discretion, particularly in view of the very short period of time in which it can be said she suffered by reason of the *738 receiving of mismatched blood. It is our judgment that the award to Mrs. Parker should be reduced to the sum of $10,000.
The Award to Mr. Parker
The jury awarded Mr. Parker $30,000. Plaintiff contends the amount of the award is inadequate to compensate Mr. Parker for his mental anguish and suffering over his wife's plight, and for the destruction of his marriage, loss of his home and car and family life. Plaintiff contends the hospital was under a contractual duty to Mr. Parker to provide proper medical services to his wife and having breached that duty is responsible for the damages resulting from the breach of contract. Defendants contend Mr. Parker is not entitled to any award under the well-established principle that a person is not entitled to damages for mental anguish and suffering arising out of injuries to another person.
The law is clear that Mr. Parker would be entitled to recover any medical or other expenses incurred by him, or by the community of acquets and gains, relating to the blood transfusion incident, the treatment therefor, or the consequences thereof. The record does not establish any such special damages. The hospital never sent Mr. Parker a bill for the hospitalization, although its attorneys did write the Parkers a letter concerning the bill on one occasion. In any event, the bill was never paid and the hospital agrees the bill is prescribed and uncollectible. No charge was made by Dr. Kemmerly other than his regular charge for prenatal care and delivery. In brief, plaintiff makes the broad-brush statement that the record is full of medical bills, but no specific medical expenses or amounts are mentioned. The evidence does not support an award for special damages such as medical expenses related to the blood transfusion incident.
The law is equally clear that Mr. Parker is not entitled to recover in tort for his mental pain, suffering and anguish brought about by his wife's injuries resulting from the hospital's fault. Sperier v. Ott, 116 La. 1087, 41 So. 323 (1906); Hickman v. Parish of East Baton Rouge, 314 So.2d 486 (La.App. 1st Cir. 1975) writ refused; Cambrice v. Fern Supply Co., 285 So.2d 863 (La.App. 4th Cir. 1973); Newman v. City of Baton Rouge, 260 So.2d 52 (La.App. 1st Cir. 1972) writ refused; Sabatier v. Travelers Insurance Co., 184 So.2d 594 (La.App. 4th Cir. 1966); Duet v. Cheramie, 176 So.2d 667 (La.App. 1st Cir. 1965); Johnston v. Fidelity National Bank, 152 So.2d 327 (La.App. 1st Cir. 1963); Vinet v. Checker Cab Co., 140 So.2d 252 (La.App. 4th Cir. 1962) cert, denied; Covey v. Marquette Casualty Co., 84 So.2d 217 (La.App. Orl. Cir. 1955); Alston v. Cooley, 5 La.App. 623 (1927).
Plaintiff contends, however, that the foregoing rule applies only to suits in tort, and that Mr. Parker's action is one for breach of a direct contractual obligation owed to him by the hospital. Plaintiff contends he is entitled to recover all of his damages, including mental anguish and suffering, caused by the hospital's breach of its contract.
It is plaintiff's contention that when Mrs. Parker was admitted to the hospital and Mr. Parker signed a form agreeing to be responsible for payment, a contractual relationship between the hospital and him was created. It is argued that an implied obligation of the hospital under the contract was to render proper medical services to Mrs. Parker, which obligation the hospital breached.
Plaintiff cites and relies on Holland v. St. Paul Mercury Insurance Co., 135 So.2d 145 (La.App. 1st Cir. 1961). In Holland, the court held that an exterminating company with which a father-homeowner had contracted for exterminating work owed a separate and direct contractual duty to the homeowner to know the components of its poison and to advise the homeowner as to the nature of the poison within a reasonable time following request for such information. Accordingly, the court held the homeowner had a cause of action in contract as well as in tort against the exterminating *739 company for damages, including mental anguish, under allegations that the exterminating company failed to supply such information when the homeowner thought his child had eaten some of the poison. The court held that the exterminating company's duty in this regard was not secondary, derivative or dependent upon injury to the child, a third party, but was independent of an alleged tort inflicted on the child.
The Holland case is distinguishable from the instant case in that here the alleged breach of duty to Mr. Parker is a breach of the same duty owed to the patient, Mrs. Parker. The hospital's duty to Mr. Parker was secondary, derivative and dependent upon its breach of duty and injury to Mrs. Parker, a third party. If there had been no breach of duty owed Mrs. Parker, there would have been no breach of a separate, direct duty owed Mr. Parker.
Although the Holland case is distinguishable, the issue raised by plaintiff is serious and difficult of resolution. Unquestionably, there is a contractual relationship between a hospital, or a physician, and the patient and also a husband or parent who is responsible for payment. Our view of the implied obligation of the hospital or physician to render proper medical service is that it is owed primarily to the patient, not to a third party responsible for payment. No separate and independent contractual duty in this respect is owed to the husband or parent responsible for payment. Our holding is that a breach of the duty to furnish proper medical services to a patient by negligent performance of the service does not give rise to a cause of action by a third party responsible for payment to recover the third party's nonpecuniary damages arising out of the breach of duty by the hospital or physician and consequent injury to the patient.
It follows that Mr. Parker is not entitled to recover nonpecuniary damages for mental anguish and the like arising out of the hospital's negligent breach of duty, contractual or delictual, owed to Mrs. Parker and her injuries resulting therefrom. The award in favor of Mr. Parker must be set aside.
Decree
For the reasons assigned: (1) the judgment in favor of plaintiff, Mrs. Theda Kay Parker Lee, against defendants, Firemen's Insurance Company of Newark, New Jersey and The Minden Sanitarium, Inc., in solido, in the amount of $20,000 is reduced to the sum of $10,000, and as amended is affirmed; (2) the judgment in favor of plaintiff, Narvel Parker, against defendants, Firemen's Insurance Company of Newark, New Jersey and The Minden Sanitarium, Inc., in solido, in the sum of $30,000 is reversed and set aside and judgment is hereby rendered rejecting said plaintiff's claims against said defendants; and (3) the judgment in favor of defendants, St. Paul Fire & Marine Insurance Company, James Robert Kemmerly, Charles Hancock, Jr. and Benny Salter, rejecting both plaintiffs' claims against said defendants is affirmed.
Amended in part, reversed in part, affirmed in part.
NOTES
[*] Bolin and Marvin, JJ., recused.